984 A.2d 395

**Rhonda KRITSINGS, et al.**

**v.**

**STATE FARM MUTUAL AUTOMOBILE INSURANCE COMPANY.**

**No. 2315 Sept.Term, 2008.**

Court of Special Appeals of Maryland.

Dec. 1, 2009.

368

Katherine O. Porwick (Paul D. Bekman, Michael P. Smith, Salsbury, Clements, Bekman, Marder & Adkins, LLC, on the Brief), Baltimore, MD, for Appellant.

Robert K. Nead (Nead, Karey & Minton, LLP, on the brief), Towson, MD, for Appellee.

Panel: JAMES R. EYLER, KEHOE and CHARLES E. MOYLAN, JR., (Retired, Specially Assigned), JJ.

JAMES R. EYLER, Judge.

On October 5, 2002, eight-year-old Carrissa Woodward ("Carrissa") was injured when the bicycle on which she was riding collided with a motor vehicle being operated by Karen Smith ("Ms. Smith"), on Shirley Manor Road in or near Reisterstown. At the time of the accident, Carrissa was insured under a policy issued by State Farm Mutual Automobile Insurance Company, appellee, to Carrissa's mother, Rhonda Kritsings, appellant. The policy included uninsured/underinsured motorist coverage in the amount of $100,000 per person ("UM coverage").

On September 14, 2005, appellant, as mother and next friend of Carrissa, filed a complaint in the Circuit Court for Baltimore County against Ms. Smith and appellee, alleging that Ms. Smith's negligent operation of her vehicle caused the accident, and alleging breach of contract against appellee for failing to pay the amount of its UM coverage. Subsequently, appellant settled with Ms. Smith upon the payment of $50,000, the limit of her liability insurance coverage. Appellant then filed a motion for partial summary judgment against appellee, on the issue of Ms. Smith's liability, based on an assertion that appellee had consented to the settlement with Ms. Smith. The court denied the motion.

Prior to the beginning of trial, counsel for the parties stipulated that the claims against Ms. Smith would be dismissed; the case would be tried on the issue of Ms. Smith's liability, and not damages; and that in the event of a judgment against appellee, appellee would pay $50,000, the limit of its UM coverage less the amount received from Ms. Smith's liability carrier. At the conclusion of evidence at trial, appellee moved for judgment. The court denied it, and a jury returned a verdict, finding that Ms. Smith was negligent and

Carrissa was not contributorily negligent. Appellee filed a motion for judgment notwithstanding the verdict, and the court granted it, on the ground that Carrissa was contributorily negligent as a matter of law.

On appeal, appellant contends the court erred in (1) denying her motion for partial summary judgment, and (2) granting appellee's motion for judgment notwithstanding the verdict. We shall affirm.

## Facts relevant to motion for partial summary judgment

On February 27, 2008, appellant filed a motion for partial summary judgment against appellee and attached an affidavit by Michael Smith, counsel for appellant. The affidavit recited that, prior to February 23, 2006, Ms. Smith's liability insurer offered its policy limits in the amount of $50,000 to settle appellant's claim, which offer was confirmed in writing. After receiving the written offer, the affiant sent a letter dated February 23, 2006, certified mail, return receipt requested, and by first class mail, to appellee, notifying it of the offer. The letter recited that it was being sent pursuant to Maryland Code (2006 Repl. Vol.), § 19–511of the Insurance Article,[1] and

---

1.  Section 19–511 was enacted in 1995, by ch. 516 of the Acts of 1995, and was moved to the Insurance Article, by ch. 11 of the Acts of 1996, without substantive change. It provides:

    (a) *Notice of settlement offer required.*—If an injured person receives a written offer from a motor vehicle insurance liability insurer or that insurer's authorized agent to settle a claim for bodily injury or death, and the amount of the settlement offer, in combination with any other settlements arising out of the same occurrence would exhaust the bodily injury or death limits of the applicable liability insurance policies, bonds, and securities, the injured person shall send by certified mail, to any insurer that provides uninsured motorist coverage for the bodily injury or death, a copy of the liability insurer's written settlement offer.

    (b) *Response to settlement offer.*—Within 60 days after receipt of the notice required under subsection (a) of this section, the uninsured motorist insurer shall send to the injured person:

    (1) written consent to acceptance of the settlement offer and to the execution of releases; or

    (2) written refusal to consent to acceptance of the settlement offer.

    (c) *Payment of settlement offer.*—Within 30 days after a refusal to consent to acceptance of a settlement offer under subsection (b)(2) of

enclosed a copy of that statute. Appellee responded by letter dated March 9, 2006. The February 23 and March 9 letters were attached to the affidavit.

The March 9 letter from appellee stated, in pertinent part:

Enclosed please find a copy of our correspondence of April 10, 2003, previously forwarded to counsel for Ms. Woodward, indicating subrogation has been waived against Karen Smith, and we are denying a future claim for underinsurance benefits. Our investigation thus far indicates Ms. Woodward was negligent for failure to stay right of center when she initiated contact with Ms. Smith's vehicle.

The April 10, 2003 letter stated, in pertinent part:

It is our conclusion your client was negligent in this accident for failure to stay right of center when she crossed the center line and initiated contact with the vehicle driven by Karen Smith. Therefore, we are unable to honor your client's claim for Underinsurance Benefits.

Please note State Farm Mutual Automobile Insurance Company is waiving subrogation against Karen Smith.

In support of her motion for partial summary judgment as to liability, appellant argued that appellee had consented to a settlement with Ms. Smith and, relying on § 19–511 and the

this section, the uninsured motorist insurer shall pay to the injured person the amount of the settlement offer.

(d) *Subrogation rights of uninsured motorist insurer.*—

(1) Payment as described in subsection (c) of this section shall preserve the uninsured motorist insurer's subrogation rights against the liability insurer and its insured.

(2) Receipt by the injured person of the payment described in subsection (c) of this section shall constitute the assignment, up to the amount of the payment, of any recovery on behalf of the injured person that is subsequently paid from the liability insurance policies, bonds, and securities.

(e) *Acceptance of settlement offer.*—The injured person may accept the liability insurer's settlement offer and execute releases in favor of the liability insurer and its insured without prejudice to any claim the injured person may have against the uninsured motorist insurer:

(1) on receipt of written consent to acceptance of the settlement offer and to the execution of releases; or

(2) if the uninsured motorist insurer has not met the requirements of subsection (b) or subsection (c) of this section.

decision in *Maurer v. Pennsylvania National Mutual Casualty Insurance Co.*, 404 Md. 60, 945 A.2d 629 (2007), argued that appellee, by virtue of its consent to settle, could not contest Ms. Smith's liability.

On March 10, 2008, appellee filed an opposition to appellant's motion. In it, appellee referenced its letters dated April 10, 2003 and March 9, 2006 and to answers to interrogatories filed in the case, in which it denied liability on the ground that Ms. Smith was not liable to appellant. Appellee acknowledged that, in July, 2006, counsel for the parties agreed that appellant could settle with Ms. Smith and the parties would dismiss their claims against Ms. Smith, but that it was pursuant to a stipulation between counsel that would govern how the case was going to be tried. Appellee asserted that it was specifically understood by all parties that the stipulation was not an admission that Ms. Smith was liable.[2] Appellee explained that, following depositions on June 19, 2006, counsel for the present parties entered into a stipulation to try the case on the issue of liability only with a judgment to be entered in the amount of $50,000 in the event liability was determined in favor of appellant. Appellee attached a letter dated July 12, 2006 from its counsel to appellant's counsel, advising it had authority to enter into the above stipulation, and it attached a letter dated July 14, 2006, from appellant's counsel confirming the above stipulation.[3] Appellee also attached a copy of the relevant portions of its policy.

On April 1, 2008, appellant filed a reply, in which she stated that appellee had either consented to settlement or had refused to respond in the manner required by § 19–511, and in either case, pursuant to § 19–511 and *Maurer*, appellee had waived its right to contest the liability of Ms. Smith. With

---

**2.** The docket entries reflect that, on April 12, 2006, the claims against Ms. Smith were dismissed.

**3.** Counsel for appellant also stated in the letter his understanding that appellee intended to file a motion for summary judgment on the issue of Ms. Smith's liability which, if granted, would terminate the litigation in circuit court. That motion was filed and denied.

respect to the letters between counsel in July, 2006, appellant stated they were "inapplicable" because *Maurer* was not issued until December, 2007, and "Plaintiff's counsel could not have foreseen the explanation in *Maurer* and now Defendant cannot escape it."

On May 6, 2008, the court denied appellant's motion on the ground that appellee's denial of Ms. Smith's liability was not a consent to settle, and the later agreement between counsel, in 2006, was with the understanding that liability of Ms. Smith was being denied.

On September 17, 2008, appellant filed a motion for reconsideration of the court's ruling, reiterating her earlier arguments. The case was scheduled for trial on September 22, 2008, and the court heard argument on appellant's motion on September 22, prior to trial. Appellee renewed its motion for summary judgment, *see* note 3, *supra*, and the court heard argument on that as well. The court denied both motions.

### Analysis of denial of motion for partial summary judgment

Appellee, under its UM coverage, agreed to pay damages, up to its limits, for bodily injury and property damage that its insured was legally entitled to collect from the owner or operator of an uninsured/underinsured motor vehicle. The policy provided that the insured could not settle with any person who may be liable for bodily injury without appellee's written consent, but it also contained language tracking the language in § 19–511. The policy contained a subrogation provision which, *inter alia*, entitled appellee, to the extent it made payment under its UM coverage, to the proceeds of any settlement recovered by the injured insured from a tortfeasor.

Before discussing the specific issue before us, providing some background information may be helpful. Since 1975, Maryland has mandated that motor vehicle liability insurance policies issued in this State contain UM coverage, providing an amount of coverage equal to the minimum amount required under the financial responsibility laws for liability coverage.

Maryland Code (1957, 1979 Repl. Vol.) Art. 48A, § 541(c); *Nationwide Mutual Ins. Co. v. Webb,* 291 Md. 721, 724, 436 A.2d 465 (1981). In 1981, the legislature amended § 541(c) to require insurers to make available to insureds the opportunity to purchase higher amounts of UM coverage than the minimum required, up to the amount of liability coverage provided to the insured. Laws of 1981, ch. 510; *Waters v. United States Fid. & Guar. Co.,* 328 Md. 700, 711, 616 A.2d 884 (1992). The 1981 amendment also required UM coverage to provide underinsurance coverage as well as uninsured coverage. Specifically, it provided that a tortfeasor is uninsured whenever the amount of UM coverage purchased by an insured exceeds the amount of the tortfeasor's liability coverage. *Waters,* 328 Md. at 713, 616 A.2d 884. The effect was to provide an injured insured with compensation equal to that which would have been available had the tortfeasor carried liability insurance in an amount equal to the amount of the injured insured's UM coverage.[4]

Policies containing UM endorsements frequently contain consent to sue and/or consent to settle clauses. A consent to sue clause usually takes one of two forms. It provides that if an insured prosecutes to judgment a tort action against the alleged tortfeasor without the consent of the UM insurer, either (1) coverage is lost or (2) the judgment is not binding on the insurer. *Webb,* 291 Md. at 732, 436 A.2d 465. Generally, consent to sue clauses have been determined to be invalid in states with statutes mandating UM coverage similar to those in Maryland. The Court of Appeals has held such clauses to be invalid. *Id.* at 736, 436 A.2d 465.

In holding consent to sue clauses invalid and as one response to the insurers' argument that declaring them invalid was unfair, the Court of Appeals pointed out that consent to

---

4. In 1992, the legislature again amended the statute to require that the amount of UM coverage be equal to the amount of liability coverage, unless affirmatively waived by the insured. *Id.* at 712 n. 4, 616 A.2d 884. The provisions relating to UM coverage currently appear in the Maryland Code, (2006 Repl. Vol., 2009 Supp.) §§ 19–509 to 19–511 of the Insurance Article.

settle clauses generally have been held to be valid, observing that such clauses provided some protection for a UM insurer to prevent its injured insured from settling with a tortfeasor without its consent. *Id.* at 740, 436 A.2d 465. The Court cited cases which upheld the validity of a consent to settle clause but also held that a UM insurer was bound by a judgment or settlement if it occurred with the UM insurer's consent, *i.e.,* it constituted an admission of liability of the tortfeasor. *Id.*

■ An injured insured with UM coverage has a tort action against the tortfeasor and a contract action against the UM insurer. *Id.* at 735–736, 436 A.2d 465. In the case of the latter, the injured insured must establish the liability of the tortfeasor to satisfy a condition under the contractual coverage. *Id.* In other words, an action on the contract requires proof of the underlying tort claim as an element of the right to recover.

■ If an injured insured files a tort action against the alleged tortfeasor, the UM insurer has a right to intervene. Even if the policy has a consent to settle clause, if the UM insurer does not consent to settlement, but is given notice of the tort action and an opportunity to intervene, but it declines, it is bound by the result, whether by judgment or settlement. *Id.* at 743, 436 A.2d 465. *Waters,* 328 Md. at 718, 616 A.2d 884.

This brings us to the issues before us, and thus, the significance of the *Maurer* case and § 19–511. In *Maurer,* the insured sued his insurer pursuant to his underinsured coverage seeking payment over and above that collected from the tortfeasor for injuries he sustained in a motor vehicle accident. The case was tried, and a jury returned a verdict in favor of the insurer. 404 Md. at 60–68, 945 A.2d 629. The insured appealed and argued that the court erred in its instructions to the jury. The Court of Appeals agreed, but for the guidance of the court and parties on remand, it addressed the effect of the fact that the insurer had consented to the insured's settlement with the tortfeasor.

The tortfeasor's liability insurer offered its policy limits to the insured. *Id.* at 65, 945 A.2d 629. Pursuant to § 19–511, the insured notified its insurer of the offer, giving the insurer 60 days to consent to the settlement offer or to send a written refusal to consent. *Id.* The insurer "consented to the settlement." *Id.* The Court's opinion does not further explain the content or form of the consent, but indicates that the insurer expressly consented.

The *Maurer* Court stated that Maryland law is clear that a carrier providing UM coverage containing a clause requiring consent to settle, "which consents to the settlement of its insured's tort claim against an uninsured/underinsured tortfeasor is bound by the settlement." *Id.* at 73, 945 A.2d 629. The UM carrier cannot thereafter contest tort liability. *Id.* After observing that the same result ordinarily occurs if the policy does not contain a clause requiring consent to settle, the Court referenced § 19–511 and stated:

Under some circumstances, where the amount of the settlement or settlements, arising out of the same occurrence, would exhaust liability limits, the uninsured/underinsured carrier is by statute given the option to consent or not to consent to the settlement. Under such circumstances, there exists a "consent to settle" clause by statute.

*Id.* at 73, n. 4, 945 A.2d 629.

At a later point in the opinion, the Court again referenced § 19–511 and stated that it

set forth certain procedures when a settlement offer was made, from an underinsured tortfeasor or the tortfeasor's liability insurer, to the injured claimant with underinsured motorist coverage. Section 19–511 also modified existing law when the underinsured carrier refused to consent to the settlement. Section 19–511, however, did not change the law when the underinsured carrier consented to the settlement.

*Id.* at 75, n. 6, 945 A.2d 629. The Court clearly regarded its statement of the effect of a consent to settle as a statement of preexisting and not new law, citing *Webb*, 291 Md. at 739–740,

436 A.2d 465; *Waters,* 328 Md. at 717–718, 616 A.2d 884; and *West American v. Popa,* 352 Md. 455, 468, 723 A.2d 1 (1998), cases in which that proposition had been stated.

Section 19–511 addresses a situation in which the liability insurer of the alleged tortfeasor offers its policy limits to the injured person. It provides that the injured insured shall send a copy of the offer by certified letter to the injured insured's insurer providing UM coverage. § 19–511(a). Within 60 days after receipt of the notice, the UM insurer shall send written consent to the acceptance of the offer or written refusal to consent. § 19–511(b). If the UM insurer refuses to consent, it must pay the amount of the settlement offer to its insured. § 19–511(c). If the UM insurer makes such payment, its subrogation rights against the tortfeasor and the right to any payments made by or behalf of the tortfeasor are preserved. § 19–511(d). If the UM insurer consents to acceptance of the offer or it does not comply with the requirements in (b) or (c), the injured insured may accept the offer from the tortfeasor and execute a release "without prejudice to any claim the injured person may have against the uninsured motorist insurer." § 19–511(e).

Prior to enactment of the statute, if a policy providing UM coverage contained a clause requiring consent to settle, and the insured settled with a tortfeasor without such consent, the insured risked breaching its contract with the UM carrier and compromising the UM carrier's subrogation rights, thus jeopardizing the insured's ability to collect underinsured payments. The effect was that the insured could not accept the settlement offer without running the risk of breaching its contract, absent consent, if the UM insurer wanted to be involved.[5] The statute changed that result, when policy limits are offered by the liability insurer for the tortfeasor. When policy limits are offered, the insurer providing UM coverage

---

5. The result was particularly inequitable when the liability insurer had low limits and wanted to offer its limits to avoid defense costs, liability was questionable, the potential damages were substantial, and the UM insurer had high limits.

must either consent to acceptance of the offer and give up its ability to contest liability or, if it refuses to consent, pay the amount of the offer, with an opportunity to recoup the amount paid. The statute protects an injured insured when a liability carrier acknowledges liability and offers its limits but the UM carrier refuses to consent to acceptance because it concludes it has nothing to lose by forcing a trial on liability. The statute enables the injured insured to get the benefit of the amount of the proceeds offered by the tortfeasor without running the risk of breaching its contract with its insurer.

█ In the case before us, there was no written consent to settle from appellee. The letters in 2003 and March, 2006 waived subrogation against Ms. Smith, expressly denied liability, and did not expressly consent to settlement. Appellant did not treat the letters as a consent to settlement, and she has cited no authority for the proposition that we should now treat them as such. Appellee's denial of liability implied that it did not consent to settlement. The waiver of subrogation did not imply consent because consent would mean that appellee intended to pay up to its limits without recourse, a result inconsistent with the denial of liability. The waiver of subrogation was consistent with appellee's position that, because Ms. Smith was not liable, it would never have to pay anything for which it would have a right to recover by subrogation.[6]

The letters between counsel in July 2006 did not reflect anything different from the above, acknowledged that liability was the issue, and reflected an agreement between counsel, and then the parties, to try the case on the liability issue only, with an agreed upon amount of damages. As stated above, *Maurer* did not change the relevant law. At the time counsel entered into the stipulation, had they intended to treat the stipulation as a consent to settle with its attendant effect under the law, there would have been no need for a trial on

---

6. Appellee denied liability on the ground that Ms. Smith was not liable; appellee did not generally deny liability based on some contractual defense other than that of the tortfeasor's liability.

liability. The stipulation addressed how the issue would be tried.

At most, appellee's response to appellant's notice, pursuant to § 19–511, constituted a violation of the statute in that appellee neither gave written consent to acceptance of the offer from the tortfeasor or written refusal to consent. Given the absence of a written consent to settle, and treating appellee's response as either a written refusal or the absence of written consent or written refusal, appellee did not pay the amount of the settlement offer to appellant. As a result of appellee's noncompliance with subsection (b) or (c), appellant, by statute, could and did accept the settlement offer and execute a release without prejudice to the claim asserted herein against appellee. § 19–511(e)(2). In other words, appellee's violation of the statute prevented it from arguing that entering into the settlement was a breach of its policy. The violation may have compromised appellee's subrogation rights, had they not been waived, but it did not have the effect of an express consent to settle or an admission of liability.

### Facts relevant to contributory negligence

At trial, Sarah Callender ("Sarah"); Officer Richard Esenwine, the investigating police officer; Ms. Smith; appellant; and Carrissa testified. We shall summarize the evidence, as it is set forth in appellant's brief, omitting the references to the record extract, and supplementing as necessary when we address the issue.

Carrissa Woodward was born on August 11, 1994. She lives with her mother, [appellant], and her younger brother Andrew [("Andrew")] in Taneytown, Maryland. The family has lived in Taneytown since 2001. Every other weekend, [appellant] took Carrissa and Andrew to visit with their father, Neal Woodward, at his parents' house in Reisterstown, Maryland. Carrissa and Andrew went to visit their father on the weekend of October 4 and 5, 2002.

On Friday, October 4, 2002, the family was celebrating Andrew's seventh birthday. As a birthday present, Andrew's father gave him a bicycle. Carrissa asked her father

if she could have a new bike too. He agreed and went out and purchased her a new bike that evening. Carrissa only rode her bike one time on Friday night.

Carrissa first learned to ride a bicycle with training wheels when she was approximately 5 years old. When Carrissa turned 6 or 7, the training wheels came off and she learned how to ride a two wheel bike. Carrissa's mother taught her daughter how to ride a bike on their dead end street in Taneytown, Maryland. The rules for riding a bike included that Carrissa was only allowed to ride her bike on the sidewalk and that she had to wear a helmet. Prior to October 2002, Carrissa had never ridden a bike in Reisterstown, Maryland, much less on Shirley Manor Road.

Shirley Manor Road is a two lane road, primarily running from east to west, through a residential neighborhood in Reisterstown, Maryland. A painted yellow centerline separates the westbound and the eastbound lanes. The roadway is bordered on both sides by concrete curbs, sidewalks and single family homes with driveways. The width of each lane is large enough to permit curbside parking. The posted speed limit is 25 miles per hour.

At approximately 6:00 p.m. on October 5, 2002, Karen Smith was returning to her home at 400 Valley Meadow Circle in Reisterstown from grocery shopping. She turned onto westbound Shirley Manor Road. She was very familiar with Shirley Manor Road. While living in Reisterstown, she drove on Shirley Manor Road three or four times per week. Based on her experience, she knew it was a neighborhood street with lots of children nearby. Children played on the sidewalks. Children played in the street, and children rode their bicycles in the street.

When Ms. Smith turned onto westbound Shirley Manor Road that day, the sun was shining bright. The road was dry. No other cars were traveling on the road, but some cars were parked along the curb. As Ms. Smith was driving, nothing obstructed her view of the road in front of her. She saw children all the way up the road, and she saw kids playing in the street.

On the day of the collision, two other children, Sarah Callender and Amber Hughes [("Amber")], were sitting on the sidewalk on the north side of the roadway in front of Amber's house located at 931 Shirley Manor Road. Sarah and Amber were talking and eating candy. Sarah had been there for approximately 15 to 20 minutes before she first saw Carrissa. When Sarah first saw Carrissa, Carrissa was riding her bicycle on the same sidewalk where Sarah was sitting. Carrissa's brother, Andrew, and half sister Brittany [("Brittany")] were also riding together on Andrew's bike.

At the time of the accident, Sarah saw Carrissa riding "up the street" (west) on the opposite sidewalk from where she was sitting. Andrew and Brittany were on one bike on the same sidewalk as Sarah was sitting and they were riding down the street (east). Sarah next saw Carrissa riding her bicycle across Shirley Manor Road directly toward her.

Meanwhile, as Ms. Smith was approaching 931 Shirley Manor Road in the westbound lane, the sun was shining bright in her lane and she did not see Carrissa crossing the road toward the north. Her car struck Carrissa in the middle of the westbound lane. Carrissa flew off the bicycle, hit the windshield, and ended up lying on the trunk of the car. Carrissa's bike became sandwiched underneath Ms. Smith's car. Prior to hitting Carrissa, Ms. Smith did not apply her brakes or sound her horn. Neither Carrissa nor Sarah saw Ms. Smith's vehicle prior to the accident. According to Ms. Smith, the first time she that saw [sic] Carrissa was when Carrissa hit the windshield of her car.

At the close of evidence, appellee moved for judgment. The court stated that, in its view, the issue of contributory negligence was close, but it was going to submit the case to the jury. The jury found that Ms Smith was negligent and that her negligence was a proximate cause of the accident. The jury found that Carrissa was not contributorily negligent.

On November 19, 2008, appellee moved for judgment notwithstanding the verdict. The court, in granting the motion, explained:

This case, first of all, was very well tried on both sides and it was a pleasure to preside over it. I frankly at the conclusion of the evidence on the law at that time—I think I said this at the time—I considered not allowing it to go the jury because while it is a tender years doctrine case and you have to judge the child's actions in light of her age, experience, similar circumstances, one of the unique things about the evidence in the case was the child's mother testified. And not only did we have what would an average child of that age know, we had the mother saying what that child had been instructed in terms of riding a bike, not being allowed to cross the street and similar things.

The evidence was clear that basically for whatever reason, either coming out of the driveway or sort of u-turning on her bike, she came back across in the line of an oncoming car. So that was an action which she knew at that time, based upon her own training through her parents, was something she shouldn't do.

At the conclusion of the evidence I allowed the case to go to the jury because it seemed to me to be unfair, having tried it, to not see what the jury did with it, so the issue would be later framed, in the event that the jury awarded a judgment, would be later framed to go up on appeal. It seemed silly at that point to deny the jury an opportunity to deliberate. But I did think there was contrib[sic] as a matter of law based upon the evidence at the conclusion of the trial.

### Analysis of contributory negligence issue

■ Appellant observes that, with respect to contributory negligence, children under the age of 10 are evaluated according to their "age, experience and training," citing *Richards v. Goff*, 26 Md.App. 344, 357, 338 A.2d 80 (1975), and *Oddis v. Greene*, 11 Md.App. 153, 157–58, 273 A.2d 232 (1971). The circuit court referred to this as the "tender years doctrine."

Appellant argues there was evidence that Carrissa had been riding a bike only for about two years prior to the accident; had been riding a bike without training wheels for only

approximately one year prior to the accident; and that at the time of the accident, she was riding a new bike in an unfamiliar neighborhood with more vehicular traffic than she was used to.

Appellant relies heavily on *Taylor v. Armiger*, 277 Md. 638, 358 A.2d 883 (1976). In *Taylor*, a five-year-old child rode his tricycle from a private driveway onto a roadway where he was hit by a motor vehicle. The Court, after concluding there was evidence of primary negligence by the motor vehicle operator, based on speeding and the operator's knowledge that frequently children played in the neighborhood, held that the question of contributory negligence of the child was for the jury. *Id.* at 642, 358 A.2d 883. The court reviewed the law generally with respect to the age at which a child cannot be contributorily negligent as a matter of law and reiterated its holding in an earlier case that a child age 5 or older may be guilty of contributory negligence. *Id.* at 651, 358 A.2d 883. At age 5 or older, the issue is analyzed in terms of the evidence as to the child's age, experience, and training to show the level of knowledge of the risks associated with the conduct in question. *Id.* The court pointed out that the child was five years and eight days old, *Id.* at 639, 358 A.2d 883, and there was no evidence to show his intelligence, degree of maturity, and ability or willingness to follow instructions. *Id.* at 643, 358 A.2d 883.

In contrast, Carrissa was approximately eight years and two months old at the time of the accident. Moreover, appellant testified that she taught Carrissa how to ride a two wheel bike; that she knew she was not to ride in the street; and that she was aware that she should not cross a street in the middle of a block if traffic was coming. The evidence that Carrissa was not very familiar with the bike she was riding at the time of the accident[7], and not used to riding in the neighborhood, has nothing to do with Carrissa's conduct. Carrissa did not

---

7. Carrissa testified that she rode the bike one time on October 4 and "a whole bunch" on October 5, prior to the accident.

fall off of the bike or engage in some movement based on lack of unfamiliarity but rather was crossing from one side of the street to the other at a right angle or close to a right angle to the roadway when the accident occurred. The testimony at trial was that she was riding her bike on the sidewalk on one side of the street, and Brittany, age 14 at the time, with Andrew on the back of her bike, was riding on the other side of the street. Brittany turned around to proceed in the opposite direction. When Carrissa saw Brittany turn, Carrissa entered the street in front of the oncoming vehicle. The evidence was that Carrissa understood the training she had received and the risks associated with her actions. *See* Maryland Code (2002 Repl. Vol.), § 21–404(a) and (b) of the Transportation Article (vehicle entering highway from other than a highway shall stop and yield the right-of-way to any vehicle approaching on the highway), and *Richards v. Goff,* 26 Md. App. 344, 356–57, 338 A.2d 80 (1975) (A seven year, eight month old minor contributorily negligent as a matter of law when rode bicycle, a vehicle, from driveway into roadway).

**JUDGMENT AFFIRMED. COSTS TO BE PAID BY APPELLANT.**