42 A.3d 637

**TOWN OF OXFORD, et al.**

v.

**Constantine KOSTE.**

**No. 2355, Sept. Term, 2010.**

Court of Special Appeals of Maryland.

April 26, 2012.

Brynja M. Booth (David R. Thompson, Cowdrey Thompson, on the brief), Easton, MD, for Appellant.

Michael G. Rust (Armistead, Griswold, Lee & Rust, PA, on the brief), Easton, MD, for Appellee.

Panel: ZARNOCH, GRAEFF, CHARLES E. MOYLAN, JR. (Retired, Specially Assigned), JJ.

ZARNOCH, J.

Which comes first: a law's enactment or a referendum drive? In this case, we consider the classic chicken/egg causality riddle in the legislative/political setting.[1] And, in the context of the petitioning to referendum of a municipal annexation resolution, we conclude that the Legislature has required enactment to precede petitioning.[2] We turn from the abstract to the concrete.

On December 3, 2010, the Circuit Court for Talbot County granted summary judgment in favor of appellee Constantine Koste ("Koste"), a resident and registered voter of the Town of Oxford ("the Town"), appellant. In so doing, the circuit court ruled that signatures on a referendum petition may be collected before the public hearing and final enactment of an annexation resolution. The Town appeals, and presents one question for our consideration, which we have re-phrased:

> In determining whether a petition for referendum of a municipal annexation referendum complies with Md.Code (1957, 2005 Repl.Vol.) Art. 23A § 19(g), may signatures obtained prior to the date of final enactment be properly counted? [3]

For the reasons set forth below, we answer in the negative and reverse the ruling of the circuit court.

## FACTUAL AND LEGAL BACKGROUND

The Town of Oxford is surrounded on three sides by the waters of the Tred Avon River and Town Creek. On July 14,

---

**1.** For more on "the riddle of origin," *see* Roy Sorenson, *A Brief History of the Paradox* (2005), at pp. 1–18.

**2.** We focus only on this singular setting and express no view on the permissibility of pre-enactment referendum drives in other contexts. *See* n. 12, *infra*.

**3.** The Town phrases the issue in the following terms:
Did the Circuit Court err, as a matter of law, in its interpretation, construction, and application of Md. Ann.Code Article 23A, § 19 to the undisputed facts of this case?

2009, the President of the Commissioners of the Town of Oxford ("the Commissioners" or "the Town") introduced an annexation resolution, Resolution No. 1001, intended to annex 142 acres of submerged lands under public waters adjacent to the current municipal boundary. The purpose of the annexation was to confirm the Town's jurisdiction over adjacent lands and waters of the Tred Avon River in order to regulate, with the Maryland Department of the Environment, the placement of wharves, piers, mooring piles, mooring buoys, floating docks, and other structures within municipal waters.

As required by § 19(d) of Art. 23A, public notice of this resolution and the area to be annexed by the Town was published in *The Star Democrat,* a newspaper of general circulation in Oxford, for four consecutive weeks beginning on August 10, 2009. The notice read, in part:

> Please take notice that the Commissioners of Oxford will conduct a public hearing on Tuesday, September 22, 2009, at 8:00 p.m. on Resolution Number 1001, entitled "A RESOLUTION OF THE COMMISSIONERS OF OXFORD TO ANNEX SUBMERGED LANDS LOCATED UNDER CERTAIN PUBLIC WATERS ADJACENT TO THE TOWN BOUNDARIES IN ORDER TO REGULATE PLACEMENT OF WHARVES, PIERS, MOORING PILES, MOORING BUOYS, FLOATING DOCKS AND ASSOCIATED OR RELATED STRUCTURES."

The notice additionally informed the public that "[t]he technical legal description of the land proposed for annexation, together with a plat depicting the area to be annexed, and the proposed new boundary of the Town of Oxford, may be inspected at the Town Office." [4]

On September 22, 2009, after the fourth and final publication of the notice, the Commissioners held a public hearing on

---

4. Before the public hearing on the annexation resolution, § 19(*o*) of Art. 23A requires the legislative body to adopt an "annexation plan" for the area proposed to be annexed. According to § 19(*o*)(2), the annex-

the resolution as required by § 19(d) of Art. 23A. The minutes of that hearing reflect that it lasted several hours, with numerous citizens speaking for and against the resolution, taking issue with the resolution's fiscal impact, necessity, and the purported lack of transparency surrounding the legislative process. Maps of the proposed annexation were displayed, and proponents discussed the safety issues underpinning the proposal.

After the hearing, the Commissioners held the record open to receive written comments for an additional 10 days. On November 10, 2009, the Commissioners unanimously voted to adopt Resolution No. 1001 without alteration, signed the resolution, and specified in a section titled "Effective Date":

This Resolution shall become effective 45 days after final enactment unless a petition for referendum has been filed prior thereto in accordance with Article 23A Section 19 of The Maryland Annotated Code. This resolution shall be deemed "finally enacted" on the date on which the Commissioners of Oxford indicate their approval of this Resolution by signing the same.[5]

Forty-two days later, on December 22, 2009, Koste's attorneys presented the Commissioners and Town Clerk with a petition for referendum (the "Petition"). The Petition, which consisted of 31 pages containing 195 signatures, demanded that the Town suspend the effectiveness of the resolution and hold a referendum election pursuant to Art. 23A § 19(g).[6]

The Petition stated:

---

ation plan shall be open to public review and discussion at the public hearing, "but amendments to the annexation plan may not be construed in any way as an amendment to the resolution, nor may they serve in any manner to cause a re-initiation of the annexation procedure then in process." The plan is not part of the record in this case.

5. Because the Town has no chief executive, such as a mayor, the resolution, although having the effect of an ordinance, was not subject to veto. Thus, the date the Commissioners approved and signed the resolution was the date of final enactment.

6. Section 19(g) states:

We, the undersigned voters of the Town of Oxford, hereby petition to refer Resolution 1001 entitled "A RESOLUTION OF THE COMMISSIONERS OF OXFORD TO ANNEX SUBMERGED LANDS LOCATED UNDER CERTAIN PUBLIC WATERS ADJACENT TO THE TOWN BOUNDARIES IN ORDER TO REGULATE PLACE-MENT OF WHARVES, PIERS, MOORING PILES, MOORING BUOYS, FLOATING DOCKS AND ASSOCI-ATED OR RELATED STRUCTURES" to a vote of the registered voters of the Town of Oxford for approval or rejection at an election to be held in accordance with Article 23A, Section 19 of the Annotated Code of Maryland.

If the full text of the bill/ordinance or part of the bill/ordinance referred (the "proposal") does not appear on the back of this signature page or as an attachment, a fair and accurate summary of the substantive provisions of the proposal must appear on the back or be attached, and the full text of the proposal must be immediately available from the petition circulator.[7]

*NOTICE TO SIGNERS: Sign and print your name (1) as it appears on the voter registration list; OR (2) your surname of registration and at least one full given name AND the initial of any other names. Please print or type all other information other than your signature.*

---

At any time· within the forty-five (45) day period following the final enactment of the resolution, a number of persons equal to not less than twenty per centum (20%) of the qualified voters of the municipal corporation may, in writing, petition the chief executive and administrative officer of the municipal corporation for a referendum on the resolution. Upon the presentation of a petition to the officer, he shall cause to be made a verification of the signatures thereon and shall ascertain that the persons signing the petition represent at least twenty per centum (20%) of the qualified voters of the municipal corporation. Upon verifying that the requirements of this subsection have been complied with, the officer shall by proclamation suspend the effectiveness of the resolution, contingent upon the results of the referendum.

Subsections (i) through (*l*) of § 19 govern the referendum election.

**7.** The record does not contain what information, if any, was contained on the flip side of the petition sheets.

In addition to providing space for the signer to print his or her full name, registration address, and signature, the Petition also contained an area for the signer to indicate the date of signing.[8]

The next day, the Town Clerk submitted the Petition to the Oxford Board of Supervisors of Elections (the "Election Board") for verification. By tally of the Election Board, there were 616 registered voters in Oxford as of December 25, 2009 and the Petition contained 177 verified and valid signatures. However, the Election Board analysis revealed that, of the 177 signatures, only 62 were obtained after the final enactment of Resolution No. 1001. The remaining 115 signatures were acquired before the November 10, 2009 final enactment, and 83 of those signatures were obtained even before the September 22, 2009 public hearing.

The Commissioners then requested a legal opinion from the Attorney General to determine whether the signatures obtained before the final enactment of the resolution could be counted toward the threshold necessary to petition for the referendum. Before such an opinion could be prepared, on May 1, 2010, Koste filed in the circuit court a Complaint for Declaratory Judgment and Writ of Mandamus as well as a Motion for Summary Judgment. Koste sought both a declaration that the 177 signatures were valid and represented at least 20 percent of the registered voters in the Town, and a mandamus requiring the Commissioners to suspend the effectiveness of the resolution, contingent upon the results of a referendum. The Town filed an answer and opposition, requesting an order declaring that the Petition failed to meet

---

**8.** The petition sheets appear to be based on State Election Board forms designed for local government referenda in accordance with Md.Code (2003, 2010 Repl.Vol.), State Election Law Article ("Elec."), § 6–103(b). Section 6–203(a)(2)(iii) requires such a petition to contain "the date of signing." Under § 6–203(b)(6), a signature shall be validated and counted "if applicable, the signature was affixed within the requisite period of time, as specified by law." However, these provisions on local referenda do not apply to "a petition filed pursuant to Article 23A of the Code." § 6–102(b).

the applicable legal requirements and thus, Resolution No. 1001 became effective as a matter of law on or before December 26, 2009.

A hearing on Koste's motion for summary judgment was held on December 3, 2010. In granting the motion, the circuit judge delivered the following opinion:

> This is how I see it. First of all, in my view the statute is not ambiguous. In my view the 45 day period in question is a, the primary import of that 45 day period is to limit the time within which a petition can be presented so there is some finality to this process. So that the municipality is not held up *ad infinitum* by endless discussions and debate. I believe that the 45 day period is there for the time within which the petition must be presented and I don't believe it has any bearing on when the signatures are obtained, or whether the signatures are obtained prior to that 45 days.... The plain language of the statute does not expressly require that signatures be obtained during that 45 day period. And I believe ... the primary purpose of the statute is to provide an exit point, and not a beginning point for the process.... To me it would defy common sense and the basic democratic notion that we have adopted in our system of laws to say that you can't start early, you can't be more thorough, that you cannot start this petition process more than 45 days before it ends. I mean where is the logic in that? If anything they've given people more time to think about it and not less. And you know the basic concept here is that we ought to give the people the opportunity to be heard. That's the democratic process. And so I think that the public policy is very important here that we not deny such a big constituency, such a big percentage, more than 20 percent the opportunity to present this matter for referendum.

Accordingly, in an order dated December 3, 2010, the trial court declared that all 177 signatures on the Petition were valid and that the signatures represented at least 20 percent

of the qualified voters of the Town of Oxford.[9] The court ordered the Commissioners to suspend the effectiveness of Resolution No. 1001 contingent upon the results of a referendum election. Finally, the court ordered that within 60 days the Commissioners were to hold the referendum.[10] The Commissioners noted an appeal to this Court.

For the reasons discussed below, we reverse the decision of the circuit court and remand for entry of a declaratory judgment consistent with this opinion.

## DISCUSSION

### I. Standard of Review/Tenets of Statutory Construction

We review the trial court's determination of legal questions or conclusions of law *de novo*. *Tribbitt v. State*, 403 Md. 638, 644, 943 A.2d 1260 (2008); *see also Schisler v. State*, 394 Md. 519, 535, 907 A.2d 175 (2006) (noting that when an issue "involves an interpretation and application of Maryland constitutional, statutory or case law, an appellate court must determine whether the trial court's conclusions are 'legally correct' under a *de novo* standard of review"). Summary judgment is proper "only where there is no genuine dispute of material fact and the moving party is entitled to judgment as a matter of law." *Id.; see also* Md. Rule 2–501. Here, the facts are undisputed and this appeal presents a purely legal issue that we review *de novo*.

This case presents an issue of statutory construction, like many, resolvable on the basis of judicial consideration of three general factors: 1) text; 2) purpose; and 3) consequences. Text is the plain language of the relevant provision, typically given its ordinary meaning, *Breslin v. Powell*, 421 Md. 266, 286, 26 A.3d 878 (2011), viewed in context, *Kaczorowski v. City of Baltimore*, 309 Md. 505, 514, 525 A.2d 628 (1987), considered in light of the whole statute, *In re Stephen K.*, 289 Md.

---

9. Although labeled an "order," it declared the rights of the parties and constituted a declaratory judgment.

10. Although the Commissioners did not obtain a stay of the December 3, 2010 order, the referendum has not yet taken place.

294, 298, 424 A.2d 153 (1981), and generally evaluated for ambiguity. *Kaczorowski*, 309 Md. at 513, 525 A.2d 628. Legislative purpose, either apparent from the text or gathered from external sources, often informs, if not controls, our reading of the statute. *Kaczorowski*, 309 Md. at 515, 525 A.2d 628. An examination of interpretive consequences, either as a comparison of the results of each proffered construction, *Christian v. State*, 62 Md.App. 296, 303, 489 A.2d 64 (1985), or as a principle of avoidance of an absurd or unreasonable reading, *Kaczorowski*, 309 Md. at 513, 516, 525 A.2d 628, grounds the court's interpretation in reality.

## II. Text

Our analysis must necessarily begin with a review of the statute in question. Article 23A § 19, governs the process by which a municipal corporation may annex adjacent land not within its boundaries. Both the circuit court and the parties in this case urge us to parse the language of § 19(g) of Art. 23A. Among other things, Koste directs our attention to the following language:

> *At any time* within the forty-five (45) day period following the final enactment of the resolution, a number of persons equal to not less than twenty per centum (20%) of the qualified voters of the municipal corporation may, in writing, *petition the chief executive and administrative officer* of the municipal corporation for a referendum on the resolution. *Upon the presentation of a petition to the officer,* he shall cause to be made a verification of the signatures thereon and shall ascertain that the persons signing the petition represent at least twenty per centum (20%) of the qualified voters of the municipal corporation....

(Emphasis added). The Town's argument emphasizes in part this reading:

> At any time *within the forty-five (45) day period following the final enactment of the resolution,* a number of persons equal to not less than twenty per centum (20%) of the qualified voters of the municipal corporation may, in writing, *petition* the chief executive and administrative officer of the

municipal corporation *for a referendum on the resolution.* Upon the presentation of a petition to the officer, he shall cause to be made a verification of the signatures thereon and shall ascertain that the persons signing the petition represent at least twenty per centum (20%) of the qualified voters of the municipal corporation. Upon verifying that the requirements of this subsection have been complied with, the officer shall be proclamation suspend the effectiveness of the resolution, contingent upon the results of the referendum.

(Emphasis added).

Obviously, the parties are contemplating different definitions of the word, "petition." One general definition of "petition," which Koste would likely embrace, is "a formal written request presented to a court or other official body." *Black's Law Dictionary* (8th Ed. 2004) at 1182. On the other hand, a definition more attuned to the referendum context and more supportive of the Town is found in Elec. Art. § 6–101(i), which states in relevant part: " 'Petition' means all of the associated pages necessary to fulfill the requirement of a process established by the law by which individuals affix their signatures as evidence of support for ... placing ... a question on the ballot at any election." [11] Koste contends that the term, "presentation of a petition," in the second sentence of § 19(g) of Article 23A equates with the act of "petitioning" Town officials in the first sentence. A contrary argument would emphasize that "presentation of a petition" suggests a difference between presentation and petition and that reference to the 45–day period appears only in the first sentence, which uses the term "petition for a referendum."

Thus, Koste reads the 45–day period only as a deadline for *presenting* to Town officials the necessary signatures, while the Town says that the 45–day window establishes a beginning period as well as an ending for the *process of petitioning to*

---

**11.** Although perhaps reflective of a widely understood definition of a referendum "petition," this provision does not apply to municipal elections. *See* n. 8, *supra.*

*referendum.* Another point in the Town's favor is that § 19(g) uses the word "within" the 45–day period, more indicative of a beginning and an ending, rather than a fixed deadline, while Koste can point to the words, "[a]t anytime," as suggesting an open-ended process. To the extent this clash of textual views creates an ambiguity, we consider the purpose of the 45–day period, particularly in light of the remainder of § 19 of Article 23A.

## III. Purpose and Consequences

It is common in referendum and initiative provisions to have "a time limit on circulation of petitions." David B. Magleby, *Ballot Access for Initiatives and Popular Referendums: The Importance of Petition Circulation and Signature Validation Procedures,* 2 J.L. & Pol. 287, 291–92, 297 (1985).[12] *See also* McQuillen, *The Law of Municipal Corporations* (3rd Ed. 2004) at § 16:60 ("It generally is required that the signatures all be secured within a certain time, which may be that between certain dates, a prescribed time after publication, or a prescribed time after signature by the mayor or, in event of his or her veto, after final passage by the council. . . .").[13] The presumed rationale for a limited circulation period is most

---

12. Magleby's study indicates that of 26 states with the initiative or popular referendum, 16 have a time limit on circulation, while 10 do not. Magleby at 291. For enactments of the General Assembly, the Maryland Constitution permits referendum signatures be gathered only after passage of a bill up to an initial deadline of June 1 for one-third of the required signatures and a final deadline of July 1 for the remainder. Md. Const. Art. XVI, § 3. In contrast, § 19(c) of Article 23A, authorizes residents/voters to *initiate* the annexation process by petition, and appears to set no time limit on when signatures must be gathered.

13. McQuillen also notes that ordinarily referendums "can be utilized only as to measures that have been finally and completely passed. . . ." *Id.* at 16.52. In *Tobias v. South Jordan City Recorder,* 972 P.2d 373, 375 (Utah 1998), Utah's highest court approved a thirty-five day statutory time limit for submitting referenda after a local law is passed. Observing that the "statutory timetable is extremely short" and that "[s]ponsors of referendum petitions must move promptly to gather the required number of signatures," the court nevertheless upheld the timetable for local referenda. *See also Bissland v. Bankhead,* 171 P.3d 430 (Utah

likely the same for any substantial restriction on the referendum or initiative. Because referendum and initiative displace the acts of a representative body, the process "was not intended to be easy to fulfill." *Woodland v. Mich. Citizens Lobby,* 423 Mich. 188, 378 N.W.2d 337, 350 (1985). *See also Mayor and Town Council of Oakland v. Mayor & Town Council of Mountain Lake Park,* 392 Md. 301, 332, 896 A.2d 1036 (2006) (In a municipal annexation, "[t]he referendum process is not easy. Often it is a very difficult process to obtain the necessary number of signatures during the allotted period of time ....") (concurring opinion of Judge Cathell); and *Tyler v. Secretary of State,* 229 Md. 397, 402, 184 A.2d 101 (1962) (Those who desire to challenge the decision of the legislative body by referendum must "strictly comply with the conditions prescribed"). This differs from the rationale for a petition submission deadline. "These deadlines are motivated by the time constraints of signature validation and ballot preparation." David B. Magleby, *Direct Legislation: Voting and Ballot Propositions in the United States,* (1984) at p. 56. If § 19(g) establishes a 45-day circulation period as a substantial restriction on the referendum process, that purpose would be ill-served by an unlimited signature-gathering period.

Reading § 19(g) as providing "an exit point and not a beginning point for the process," the circuit judge said that the absence of circulation period promoted the democratic process by "giving people more time to think about it and not less." We must necessarily determine whether such a purpose is consistent with the remainder of § 19 of Art. 23A—*i.e.,* the "whole statute" and "the context" in which Subsection (g) appears. In addition, we must also consider the consequences of such an interpretation.

Subsection (d) requires multiple public notices and subsequently a public hearing, "which may be continued and rescheduled for a subsequent time not to exceed 30 days from

2007) (Though petitioners found themselves against a "tight deadline," the deadline for collecting signatures and filing a referendum petition was triggered the moment the ordinance was passed).

the day from which the meeting was originally scheduled." At this hearing, State and regional planning agencies and the county governing body have "the first right to be heard." *Id.*[14] As noted earlier, *see* n. 4, *supra,* under § 19(*o* ), the municipality must adopt an annexation plan open for public review and discussion at the public hearing. Amendments to the plan are not deemed an amendment to the resolution and do not cause a reinitiation of the annexation procedure. Obviously, the public hearing and annexation plan requirements were designed by the Legislature as an efficient mechanism for the municipality to fully inform citizens and other governmental authorities about the impact of the annexation and to address and mollify their concerns after they have been heard.

The circuit judge's belief, that the petition's signers would have "more time to think about" the resolution before the public education process begins, seems completely unrealistic. Petitions "once signed allow neither for deliberation nor for compromise," Hans A. Linde, *On Reconstituting "Republican Government,"* 19 Okla. City U.L.Rev. 193, 205 (1994). *See also* Magleby, *Direct Legislation* at 62 ("Do those citizens who sign petitions actually read what it is they are signing? The answer is generally no. Most people trust the petition circulator's description of the proposition to be accurate, and they desire to comply with the request for assistance"). A likely reading of § 19(d) and (*o* ) is that these provisions have the purpose of "giving the voters a chance to study the issue *before* being approached by circulators.") (Emphasis added). *Ibarra v. City of Carson,* 214 Cal.App.3d 90, 262 Cal.Rptr. 485, 487 (2nd App. Dist.1989).[15] It is also noteworthy that the county governing body has the same 45–day period under

---

**14.** Subsection (h) governs a petition for a referendum by the county governing body. The petition is triggered by a two-thirds vote of the body obtained "[a]t any time within the 45-day period following the final enactment of the resolution."

**15.** In *Ibarra,* a California appellate court held that signatures gathered before publication of a notice of intent to circulate a petition for an initiative could not be counted because the purpose of the notice requirement was to give voters a chance to review the initiative before

§ 19(h) to vote to petition to referendum the annexation resolution as well as the right under § 19(*o* ) to be heard first at the public hearing. It seems unlikely that the Legislature intended the petition to precede the county's right to influence the municipality's vote on the resolution at the public hearing.

Another possible consequence of the circuit court's conclusion that § 19(g) permits a frontally open-ended petition circulation period is that voters will sign a petition on a bill that could be amended before final passage, requiring "the whole effort to be undertaken anew." *Selinger v. Governor,* 266 Md. 431, 437, 293 A.2d 817 (1972).[16] In a clever attempt to limit the effect of the circuit court's ruling, Koste argues that the circulation period is not completely open-ended, but begins when the notice of the proposed resolution is given and that any substantial amendments to the resolution would require the entire process to begin anew with the introduction of a new resolution.[17] Thus, he contends, voters would never be faced with signing a petition for referendum of a resolution that substantially departs from what is finally enacted. However, the text of § 19 offers scant support for such a reading. The 45–day period is tied to "final enactment" not the first notice of the introduction of the resolution. In addition, such a proffered interpretation invites endless debates over whether an amendment is substantive or nonsubstantive with resulting uncertainty for the Town Commissioners and the petition gatherers.[18]

---

being approached by the petition's circulators. *See also Connecticut Sport Enterprises, Inc. v. Verrilli,* 30 Conn.Supp. 365, 317 A.2d 463, 466 (1974) (Obtaining signatures on a petition for referendum more than six months prior to the filing of the petition created an impermissible "possibility of staleness").

**16.** *Selinger* held that for purposes of referring a State law, a referendum petition may be circulated only after a bill has passed the General Assembly. 266 Md. at 436, 293 A.2d 817.

**17.** Koste concedes that a non-substantive amendment to the resolution would not restart the process of enactment or referendum.

**18.** Section 19 lacks the specificity of a provision like Md.Code (1984, 2009 Repl.Vol.), State Government Article § 10–113(a), which regulates changes in regulations proposed by State agencies and which provides:

Therefore, based on our examination of the text of the entire statute, its purpose and the consequences of Koste's proffered interpretation, we believe that the General Assembly intended the 45–day period of § 19(g) to be a restriction on the circulation of petitions that does not permit signatures to be gathered before final enactment of the resolution.

## IV. Relevant Caselaw

Although this statutory analysis does not favor Koste, he seeks to rescue the day on the basis of *Mayor & Town Council of Oakland v. Mayor & Town Council of Mountain Lake Park, supra.* This case involved warring municipal annexations, one of which was petitioned to referendum and the appropriate method of computing notice requirements. Koste emphasizes a factual statement in the Court's opinion that several weeks before the public hearing on the Mountain Lake Park resolution, the Town Clerk "prepared a referendum petition that was circulated to ... residents," *id.* at 306, 896 A.2d 1036; and appears to equate this fact with judicial approval of pre-enactment petition circulation. Even if prepared by the Town Clerk "several weeks before the public hearing," meant that some petitions were in fact circulated before enactment of the resolution, such a factual recital in a case having nothing to do with the validity of pre-enactment circulation of referendum petitions is less than *dicta* and in no way tantamount to a judicial blessing of what happened in this case. Moreover, other statements in the Court's opinion actually undercut Koste's position. For example, the Court notes that "the purpose of the forty-five day period is to provide citizens with sufficient time *to circulate and present* a referendum petition to the municipality...." 392 Md. at 325, 896 A.2d 1036 (Emphasis added). Again, the Court states:

If a unit wishes to change the text of a proposed regulation so that any part of the text differs substantially from the text previously published in the [*Maryland*] Register, the unit may not adopt the proposed regulation unless it is proposed anew and adopted in accordance with the requirements of §§ 10–111 and 10–112 of this subtitle.

"By operation of Art. 23A, § 19(f)-(h), each constituency receives a fixed period of time during which to consider the proposed annexation, *circulate a petition* for referendum, and ultimately, present a petition for referendum to the municipality." *Id.* at 326–27, 896 A.2d 1036. (Emphasis added).

For these reasons, we hold that the circuit court erred in concluding that under § 19(g), petition signatures gathered prior to the 45–day period before final enactment of the annexation resolution could be counted toward petitioning the resolution to referendum. Without counting pre-enactment signatures, the referendum effort failed to obtain a sufficient number. The resolution was not suspended and it became effective as enacted. Thus, we reverse the circuit court and remand for entry of a declaratory judgment consistent with this opinion.

**JUDGMENT OF THE CIRCUIT COURT REVERSED. CASE REMANDED FOR ENTRY OF A DECLARATORY JUDGMENT CONSISTENT WITH THIS OPINION. COSTS TO BE PAID BY APPELLEE.**