WOODWARD, J.,
dissenting.
I respectfully dissent.
At the outset, it is important to note that under the facts of this case, Erie does not claim, nor is there anything in the record to support a claim, that Erie was actually prejudiced by Morse’s failure to obtain Erie’s written consent prior to settling her claim against the tortfeasor for the limits of the tortfeasor’s liability policy. Thus, if the consent to settle requirement of § 19-511 is enforced in the absence of actual *34 prejudice, as Erie urges and the majority holds, “the insurer [Erie] suffers no harm and the insured [Morse] forfeits the premiums and loses coverage.” Prince George’s Cnty. v. Local Gov’t Ins. Trust, 388 Md. 162, 187, 879 A.2d 81 (2005). Notwithstanding the majority’s assertion that Erie’s lack of actual prejudice is “irrelevant,” I believe that such lack of actual prejudice is very relevant to a proper construction of § 19-511.
In Town of Oxford v. Koste, 204 Md.App. 578, 42 A.3d 637 (2012), aff'd, 431 Md. 14, 63 A.3d 582 (2013), this Court set forth the principles that guide the construction of a statute:
This case presents an issue of statutory construction, like many, resolvable on the basis of judicial consideration of three general factors: 1) text; 2) purpose; and 3) consequences. Text is the plain language of the relevant provision, typically given its ordinary meaning, viewed in context, considered in light of the whole statute, and generally evaluated for ambiguity. Legislative purpose, either apparent from the text or gathered from external sources, often informs, if not controls, our reading of the statute. An examination of interpretive consequences, either as a comparison of the results of each proffered construction, or as a principle of avoidance of an absurd or unreasonable reading, grounds the court’s interpretation in reality.
Id. at 585-86, 42 A.3d 637 (emphasis added) (citations omitted). When the text is ambiguous, we must look beyond the statute’s plain language to determine legislative intent:
“While the language of the statute is the primary source for determining legislative intention, the plain meaning rule of construction is not absolute; rather, the statute must be construed reasonably with reference to the purpose, aim, or policy of the enacting body. The Court will look at the larger context, including the legislative purpose, within which statutory language appears. Construction of a statute which is unreasonable, illogical, unjust, or inconsistent with common sense should be avoided.”
*35 Consol. Constr. Servs., Inc. v. Simpson, 372 Md. 434, 457, 813 A.2d 260 (2002) (emphasis added) (quoting Tracey v. Tracey, 328 Md. 380, 387, 614 A.2d 590 (1992)). The Court of Appeals has emphasized the importance of legislative purpose, stating that “[t]he cardinal rule [of statutory interpretation] is to ascertain and effectuate legislative intent.” Id. at 456, 813 A.2d 260 (alterations in original) (internal quotation marks omitted).
Regarding the text of § 19-511, in Buckley v. Brethren Mutual Insurance Co., 207 Md.App. 574, 53 A.3d 456 (2012), aff'd, 437 Md. 332, 86 A.3d 665 (2014), we summarized the procedure to be followed by the insured and the uninsured motorist carrier (“UM carrier”) when the liability insurer of the alleged tortfeasor offers the policy limits to the injured person. We stated:
Pursuant to § 19-511(a), when the liability insurer of the alleged tortfeasor offers its policy limits to the injured person, the injured insured must send a copy of the offer by certified letter to the injured insured’s UM carrier. § 19-511(a). Within 60 days after receipt of the notice, the UM carrier “shall send to the injured person: (1) written consent to acceptance of the settlement offer and to the execution of releases; or (2) written refusal to consent to acceptance of the settlement offer.” § 19—511(b). If the UM carrier refuses to consent to acceptance of the settlement offer, the UM carrier must pay the amount of the settlement offer to the injured person within 30 days following the refusal. If the UM insurer consents to the settlement offer, or otherwise fails to respond to the settlement offer as required by subsections (b) and (c) of § 19-511, then the injured insured may accept the settlement offer from the liability insurer and execute a release “in favor of the liability insurer and its insured without prejudice to any claim the injured person may have against the uninsured motorist insurer.” § 19-511(e).
Id. at 586-87, 53 A.3d 456 (footnote omitted).
There is no language in § 19-511 that sets forth the consequences of an insured’s failure to follow the statute’s proce *36 dure prior to accepting the tortfeasor’s liability policy limits. According to the majority, the consequence of such failure is that the UM carrier may deny coverage regardless of whether it suffered actual prejudice. Morse, on the other hand, construes § 19-511 to require actual prejudice to the UM carrier before it can deny coverage. Given the absence of statutory language, § 19-511 is ambiguous, and the question thus presented is which construction is consistent with the purpose and policy of § 19-511, and how do the results of each construction compare with each other.[1] See Simpson, 372 Md. at 457, 813 A.2d 260 (holding that ambiguity in a statute requires the court to consider the purpose and policy behind the statute and avoid unjust results); Koste, 204 Md.App. at 586, 42 A.3d 637 (noting that statutory interpretation should be grounded in a consideration of the interpretive consequences of the statutes’s proffered constructions).
In Buckley, this Court articulated the purpose and policy of the uninsured motorist statute, as well as the underlying reasons for enacting § 19-511. We said:
The purpose of the uninsured motorist statute is to provide minimum protection for individuals injured by uninsured motorists and should be liberally construed to ensure that innocent victims of motor vehicle collisions are compensated for their injuries. Consistent with the public policy of affording minimal protection for innocent victims, an insured can purchase a higher amount of uninsured motorist insurance which will become available when the insured’s uninsured motorist coverage, as well as his damages, exceed the liability coverage of the tortfeasor. The effect [i]s to provide an injured insured with compensation equal to that which would have been available had the tortfeasor carried liability insurance in an amount equal to the amount of the injured insured’s UM coverage.
*37 207 Md.App. at 589, 53 A.3d 456 (alteration in original) (emphasis added) (citations and internal quotation marks omitted). Similarly, Maryland has a “strong public policy favoring compensation of those injured by UM drivers.” Id. at 591, 53 A.3d 456.
The primary reason for enacting § 19-511 was to eliminate the potential lengthy delay caused by “ ‘a situation where the liability carrier w[ould] not give [the injured persons] the limits of the at-fault party’s policy without a release and the [UM] carrier w[ould] not allow them to give a release to the liability carrier.’ ” Id. at 590, 53 A.3d 456 (first and fourth alterations in original) (quoting Keeney v. Allstate Ins. Co., 130 Md.App. 396, 401, 746 A.2d 947 (2000)). Moreover, § 19-511 sought to strike a balance between the right of the insured to a speedy recovery of the liability policy limits and the protection of the UM carrier’s subrogation rights.
When the constructions of § 19-511 advanced by the majority and Morse are considered in the context of the purpose and policy of Maryland’s uninsured motorist statute and the reasons underlying § 19-511, the result clearly favors Morse’s construction. Morse’s construction would further the public policy of affording protection for innocent victims by allowing recovery of uninsured motorist compensation unless the UM carrier can show actual prejudice occasioned by the insured’s failure to comply with the procedural requirements of § 19-511. Where there is no actual prejudice, an insured who paid for uninsured motorist coverage equal to his or her liability coverage would receive what the statute intended: “ ‘[Compensation equal to that which would have been available had the tortfeasor carried liability insurance in an amount equal to the amount of the injured insured’s UM coverage.’ ” Id. at 589, 53 A.3d 456 (quoting Kritsings v. State Farm Mut. Auto. Ins. Co., 189 Md.App. 367, 375, 984 A.2d 395 (2009)). In addition, the balance between the insured’s right to speedy recovery and the protection of the UM carrier’s subrogation rights would be maintained by Morse’s construction, because the UM carrier would still be able to deny coverage where its subrogation rights were actually prejudiced.
*38 A comparison of the results of the different constructions of § 19-511 also support Morse’s construction. Adoption of the majority’s view results, in effect, in a windfall to the UM carrier—the UM carrier is allowed to keep the premiums paid for uninsured motorist coverage while avoiding its obligation to pay an otherwise valid claim, where the actions of the insured did not increase the risk inherent with such coverage or prejudice any subrogation rights of the UM carrier. Morse’s construction would protect a UM carrier from any real adverse impact on its subrogation rights while allowing the recovery of compensation under uninsured motorist coverage that was bought and paid for by the insured.
Finally, the views expressed in this dissent are consistent with those of Andrew Janquitto, who wrote in his treatise, Maryland Motor Vehicle Insurance:
The issue of whether an unauthorized settlement by a claimant can relieve the claimant’s insurer of its obligation to pay UM benefits is a difficult one.... A short answer is that the 1995 amendment that created what is now Section 19-511 provides a mandatory procedure that must be followed and, if it is not followed, the UM insurer is relieved of its obligation to pay UM benefits. This short answer may not be correct. Of note, Section 19-511 does not indicate that the failure to abide by its provisions relieves the UM insurer of its contractual obligation to pay. Hence, if the UM insurer can escape its obligation, it must do so by relying on a contractual consent-to-settle clause[2] But using a breach of a consent-to-settle clause to avoid the obligation to pay UM benefits is also problematic. Not only is there no provision in the UM Statute that creates an insurer’s subrogation right, there is no provision that states that a claimant’s unauthorized release of a tortfeasor is grounds for the insurer to escape paying UM benefits. Even assuming an insurer could escape its contractual and statutory obligations by enforcing a consent-to-set- *39 tie provision, it should be able to do so only if that is an equitable result. Subrogation, even when it [ ] arises out of a contract or a statute, is equitable in nature.... [A] court must seek to strike a balance between the claimant’s right to compensation and the insurer’s right to subrogation. Certainly, a mere loss of a theoretical right of subrogation rights should not cause the loss of an injured claimant’s right of recovery, for such a holding would not be an equitable one. An insurer, simply put, must show that there was a realistic likelihood that it would have recovered had it exercised the subrogation rights. In other words, an insurer must show that it has been actually or materially prejudiced by the release of the tortfeasor.
Andrew Janquitto, Maryland Motor Vehicle Insurance § 8.12(B), at 471 (3d ed. 2011) (footnote omitted).
For the foregoing reasons, I would reverse the judgment of the circuit court.

. Although Morse relies on § 19-110 to arrive at her construction of § 19-511, I do not believe that such reliance is necessary to come to the same conclusion.

. In the instant case, Erie relied upon its contractual consent-to-settle clause to deny Morse her UM claim.