53 A.3d 456

**Ember Louise BUCKLEY**

v.

**The BRETHREN MUTUAL INSURANCE COMPANY.**

No. 1855, Sept. Term, 2010.

Court of Special Appeals of Maryland.

Sept. 26, 2012.

**576**

John B. Bratt (Miller & Zois, LLC, on the brief) Glen Burnie, MD, for appellant.

Kathleen M. McDonald (Kerr McDonald, LLP, on the brief) Baltimore, MD, for appellee.

Panel: EYLER, DEBORAH S., WOODWARD and KEHOE, JJ.

KEHOE, J.

This case involves a dispute between Ms. Ember L. Buckley, appellant, and her automobile insurance company, The

Brethren Mutual Insurance Company ("Brethren"), appellee. After suffering injuries as the passenger in a vehicle involved in an accident, Buckley recovered a settlement against GEICO, the driver's insurance company. Buckley then filed a breach of contract claim against Brethren in the Circuit Court for Baltimore County after Brethren refused to issue a payment to Buckley under the uninsured/underinsured motorist ("UM") provision of her insurance policy. Buckley appeals from an entry of summary judgment entered in favor of Brethren. There are two issues before us in this appeal:

I. Whether, in the context of the UM settlement procedures set out in MD.CODE ANN. INS. § 19–511, the circuit court erred in ruling that Buckley's claim for UM benefits against Brethren was barred by a general release executed in favor of GEICO that released GEICO and "all other persons, firms or corporations."

II. Whether Brethren's response to the settlement offer executed between Buckley and GEICO constituted a consent to the settlement.

With regard to the first issue, we conclude that the circuit court erred in ruling that Buckley's claim for UM benefits was barred by the release that she executed with GEICO. As for the second issue concerning Brethren's consent, it is our view that further fact finding is needed to resolve this matter. We vacate the order granting summary judgment and remand this case to the circuit court. On remand, the court must determine if Brethren's response to GEICO's settlement offer with Buckley constituted a consent to the settlement.[1]

FACTUAL AND PROCEDURAL BACKGROUND

Buckley was involved in a car accident as a passenger in a vehicle on March 18, 2007. The accident was caused by Mr.

---

1. Because we rule in favor of Buckley on the first issue, we need not address her argument that Brethren should be equitably estopped from asserting the release as a defense to her claim for a UM payment.

Harvey L. Betts, the owner and operator of the vehicle in which Buckley was a passenger.

Betts was covered by a liability insurance policy issued by GEICO, with policy limits of $100,000. On Betts's behalf, GEICO offered to settle Buckley's injury claim by paying her the policy limit of $100,000. In return, GEICO requested that Buckley execute "a full and final Release of any and all claims and liens."

Buckley maintained an automobile insurance policy with Brethren. The Brethren policy provided Buckley with UM benefits in the amount of $300,000.

Buckley's counsel at the time [2] sent two letters to Brethren to obtain Brethren's consent to accept the settlement offer issued by GEICO. The letters were received by Ms. Karen Kidwell, Brethren's adjuster assigned to Buckley's bodily injury claim. In her answers to interrogatories, Ms. Kidwell explained that she understood that "Harvey Betts' automobile policy had insufficient limits to pay damages for Plaintiff's injuries" and that Buckley's "medical bills incurred were more than Mr. Betts' insurance limits." On October 30, 2007, Ms. Kidwell sent Buckley's counsel a letter confirming that "[w]e will waive any subrogation action against Mr. Betts."

After receiving this letter from Brethren, Buckley accepted the settlement offer that GEICO extended on behalf of Betts. In exchange for payment of $100,000, Buckley executed a broad release form with GEICO, provided by GEICO. The relevant language in the release states:

> I/we, **Ember Buckley** . . . for and in consideration of a draft for the sum of **one hundred thousand dollars ($100,000.00)** . . . do . . . hereby remise, release, and forever discharge **Harvey Betts,** Releasee(s), successors and assigns, and/or his, her or their associates, heirs, executors and administrators, *and all other persons, firms or corporations* of and from any and every claim, demand, right or cause of action, of whatever kind of nature, on account of or in any way

---

2. Buckley is now represented by different counsel.

growing out of any and all personal injuries and consequences thereof ... resulting or to result from an accident that occurred on or about the **eighteenth** day of **March, 2007,** at or near **Saw Mill Court Baldwin, MD.**

(Bold in original; italics and underline added).

After executing the release, Buckley requested payment from Brethren to cover her remaining medical expenses under the UM provision of her insurance policy with Brethren. Brethren refused to pay.

On August 19, 2008, Buckley filed a breach of contract claim in the Circuit Court for Baltimore County, demanding judgment against Brethren for the policy limits of $300,000.[3] Brethren's original answer to the complaint cited, *inter alia,* failure to state a claim, contributory negligence and assumption of the risk as possible defenses. After receiving document production from Buckley, including a copy of the release, Brethren filed an amended answer specifically asserting that Buckley's claim was barred by the release that she executed with GEICO.

Both parties filed motions for summary judgment concerning the release and its effect on Buckley's claim against Brethren. Brethren argued that "the language of the Release, which is clear on its face, released all claims Buckley may have had against anyone in the world," therefore summary judgment in its favor was proper. Buckley argued that "the Release ... only releases Harvey Betts and not [Brethren] from liability in this case." Buckley also argued that this interpretation is logical because she acted in accordance with MD. CODE ANN. INS. § 19–511 (1997, 2011 Repl.Vol.), which sets out the rules for collecting a UM payment from insurance carriers like Brethren.

The circuit court conducted a hearing on the parties' motions for summary judgment on July 21, 2009. At the hearing,

---

**3.** Because of the $100,000 she received from GEICO, Buckley was entitled to receive $200,000 from Brethren under the UM provision of her insurance policy.

Buckley raised an additional argument that Brethren was equitably estopped from asserting the release as a defense because Buckley executed the release in reliance on Brethren's consent to her doing so.

On August 2, 2010, the circuit court entered summary judgment in favor of Brethren. The court concluded that the release that Buckley executed with GEICO released Betts, GEICO, "and all other persons, firms or corporations ... of whatever kind of nature ..." The circuit court found that "*Pemrock, Inc. v. Essco, Co.*, 252 Md. 374, 249 A.2d 711 (1969) stands for the proposition that when an insured party signs an integrated, broad-form release, releasing not only the settling tortfeasor/releasee (and his or her insurer) but also 'all other persons, firms [and] corporations,' the prophylactic language in the written release must be given dispositive significance." Ms. Buckley filed a motion for reconsideration, which was denied.

While the instant litigation was pending before the circuit court, Buckley filed a complaint against Brethren with the Maryland Insurance Administration ("MIA") pursuant to § 27–1001 of the Insurance Article. The issue before the MIA was "whether Brethren acted with an absence of good faith in refusing to pay Plaintiff's [UM] claim." [4]

The MIA concluded that Brethren acted in the absence of good faith. It began its discussion by stating the following:

> Undoubtedly, there is a fine line between a responsible insurer legitimately defending a claim and an insurer whose sole aim is to avoid the payment of a valid claim. The record of the instant case demonstrates that Brethren's goal was to avoid paying the policy limit of $200,000.00 on a claim that clearly warrants the payment of policy limits as the claimant had serious injuries, legitimate medical expenses of

---

**4.** The Insurance Article defines "good faith" as "an informed judgment based on honesty and diligence supported by evidence the insurer knew or should have known at the time the insurer made a decision on a claim." § 27–1001(a).

over $200,000.00, ongoing medical issues, as well as pain and suffering.

An insurer fails to make an informed decision based on honesty and diligence when it denies payment of a claim for reasons that are contrary to the clear dictates of Maryland law.

The MIA proceeded to discuss the parties' contentions issue by issue. Most relevant to the proceedings before us, the MIA considered Brethren's argument that the release must be read to release Brethren from its obligation to pay money under the UM policy with Buckley. The MIA concluded that "[t]his position is inconsistent with the plain language of § 19–511(e)." The MIA reasoned:

Here, the release was executed within th[e] clear statutory framework [of § 19–511], which defines the permissible scope of a release when UM insurance is involved. Brethren cites a number of cases to support its position that the release must be read to release Brethren. However, none of the cases cited involve releases executed pursuant to the statutory requirements of § 19–511 and they are, therefore, inapposite.

Section 19–511 governs UM settlement procedures and must be read within the context of Maryland's strong public policy favoring compensation of those injured by UM drivers. *Forbes v. Harleysville Mut. Ins. Co.*, 322 Md. 689, 697 [589 A.2d 944] (1991). Section 19–511(e) dictates that a release in a UM case cannot prejudice any claim that the injured person may have against the UM insurer. Therefore, the release in the instant case, like [a] provision of an insurance policy, must be viewed as having been drafted and signed consistently with the enabling statute. *See, Parsons v. Erie Ins. Group*, 569 F.Supp. 572, 579 (D.Md.1983) (provision of policy that conflicts with requirements of UM statute is invalid); *Forbes v. Harleysville Mut. Ins. Co.*, 322 Md. 689, 698 [589 A.2d 944] (1991) (policy limitations on coverage or exclusions inconsistent with purpose of UM statutory provisions, are unenforceable); *Pennsylvania Nat. Mut.*

*Cas. In. Co. v. Gartelman,* 288 Md. 151, 156 [416 A.2d 734] (1980).

In fact, Brethren concedes that the release was executed "[a]s per the terms of § 19–511(e)." The record clearly indicates that all parties, including Brethren, intended that the release be limited to claims between Ms. Buckley and Mr. Betts/GEICO. The release document, its attached hold harmless agreement, and the correspondence between the parties reference a release only as to Ms. Buckley and Mr. Betts/GEICO. Additionally, Brethren's initial denial of Ms. Buckley's UM claim on July 2, 2008 did not mention the release, but cited a tort defense as the reason for the denial of the claim.

Brethren is responsible for knowing and abiding by the provisions of the Insurance Article, including § 19–511(e). To take a position that is so clearly at odds with the plain terms of the statute rises to the level of absence of good faith.[5]

On October 13, 2010, Buckley noted an appeal from the circuit court's order granting summary judgment in favor of Brethren.

## STANDARD OF REVIEW

The Court of Appeals stated the standard of review for the entry of summary judgment in *Barbre v. Pope,* 402 Md. 157, 171–72, 935 A.2d 699 (2007) (citations and quotations omitted):

> [An appellate court] reviews an order granting summary judgment *de novo.* In so doing, we must determine, initially, whether a dispute of material fact exists. A material fact is a fact the resolution of which will somehow affect the outcome of the case. The facts properly before the court as well as any reasonable inferences that may be drawn from them must be construed in the light most favorable to the non-moving party. If the record reveals that a material fact

---

5. Brethren filed a petition for judicial review of this MIA decision in the Circuit Court for Baltimore County. That case has been stayed pending the resolution of the case before us.

is in dispute, summary judgment is not appropriate. If no material facts are disputed, however, then we must determine whether the Circuit Court correctly granted summary judgment as a matter of law.

## DISCUSSION

### I. The Effect of the Release

We are presented with a novel legal issue in Maryland. We must answer the question of whether a broad release that releases "all other persons, firms or corporations" from liability can immunize an injured insured's insurance company from issuing a UM payment when § 19–511(e) of the Insurance Article (1995, 2011 Repl.Vol.) expressly states that the injured insured may "execute releases in favor of the liability insurer and its insured *without prejudice to any claim the injured person may have against the uninsured motorist insurer.*" (Emphasis added).

Buckley argues that "[b]ased upon the plain language of [§ 19–511], it was impossible as a matter of law for the release Ms. Buckley signed to prejudice her right to claim UM benefits." She argues that the general release was "intended to protect Mr. Betts from claims by unknown joint tortfeasors, and from Brethren, not to protect Brethren from Ms. Buckley."

Brethren contends that "[a] release, such as that at issue in this appeal ... releases all claims, known or unknown, against all persons or entities ... even if that person or entity was not aware of the release and paid nothing for it." Brethren asserts that "Buckley signed a release far beyond that permitted under § 19–511(e)" and that, under relevant Maryland case law, the circuit court was compelled to enter summary judgment in Brethren's favor.

This dispute presents an issue of statutory construction. The dispute is "resolvable on the basis of judicial consideration of three general factors: 1) text; 2) purpose;

and 3) consequences." *Town of Oxford v. Koste*, 204 Md.App. 578, 585–86, 42 A.3d 637 (2012).

Text is the plain language of the relevant provision, typically given its ordinary meaning, *Powell v. Breslin*, 195 Md. App. 340 [6 A.3d 360] (2011), viewed in context, *Kaczorowski v. City of Baltimore*, 309 Md. 505, 514 [525 A.2d 628] (1987), considered in light of the whole statute, *In re Stephen K.*, 289 Md. 294, 298 [424 A.2d 153] (1981), and generally evaluated for ambiguity. *Kaczorowski*, 309 Md. at 513 [525 A.2d 628]. Legislative purpose, either apparent from the text or gathered from external sources, often informs, if not controls, our reading of the statute. *Kaczorowski*, 309 Md. at 515 [525 A.2d 628]. An examination of interpretive consequences, either as a comparison of the results of each proffered construction, *Christian v. State*, 62 Md.App. 296, 303, 489 A.2d 64 (1985), or as a principle of avoidance of an absurd or unreasonable reading, *Kaczorowski*, 309 Md. at 513, 516 [525 A.2d 628], grounds the court's interpretation in reality.

We first set out the text of § 19–511 of the Insurance Article and provide a brief description of how it operates. Section 19–511 states:

**§ 19–511. Uninsured motorist coverage—Settlement procedures.**

(a) *Notice of settlement offer required.*—If an injured person receives a written offer from a motor vehicle insurance liability insurer or that insurer's authorized agent to settle a claim for bodily injury or death, and the amount of the settlement offer, in combination with any other settlements arising out of the same occurrence, would exhaust the bodily injury or death limits of the applicable liability insurance policies, bonds, and securities, the injured person shall send by certified mail, to any insurer that provides uninsured motorist coverage for the bodily injury or death, a copy of the liability insurer's written settlement offer.

(b) *Response to settlement offer.*—Within 60 days after receipt of the notice required under subsection (a) of this

section, the uninsured motorist insurer shall send to the injured person:

(1) written consent to acceptance of the settlement offer and to the execution of releases; or

(2) written refusal to consent to acceptance of the settlement offer.

(c) *Payment of settlement offer.*—Within 30 days after a refusal to consent to acceptance of a settlement offer under subsection (b)(2) of this section, the uninsured motorist insurer shall pay to the injured person the amount of the settlement offer.

(d) *Subrogation rights of uninsured motorist insurer.*—

(1) Payment as described in subsection (c) of this section shall preserve the uninsured motorist insurer's subrogation rights against the liability insurer and its insured.

(2) Receipt by the injured person of the payment described in subsection (c) of this section shall constitute the assignment, up to the amount of the payment, of any recovery on behalf of the injured person that is subsequently paid from the applicable liability insurance policies, bonds, and securities.

(e) *Acceptance of settlement offer.*—The injured person may accept the liability insurer's settlement offer and execute releases in favor of the liability insurer and its insured without prejudice to any claim the injured person may have against the uninsured motorist insurer:

(1) on receipt of written consent to acceptance of the settlement offer and to the execution of releases; or

(2) if the uninsured motorist insurer has not met the requirements of subsection (b) or subsection (c) of this section.

"Section 19–511 addresses a situation in which the liability insurer of the alleged tortfeasor offers its policy limits to the injured person." *Kritsings v. State Farm Mut. Auto. Ins. Co.*, 189 Md.App. 367, 378, 984 A.2d 395 (2009). Pursuant to § 19–511(a), when the liability insurer of the alleged tortfeasor offers its policy limits to the injured person, the injured

insured must send a copy of the offer by certified letter to the injured insured's UM carrier. § 19–511(a). Within 60 days after receipt of the notice, the UM carrier "shall send to the injured person: (1) written consent to acceptance of the settlement offer and to the execution of releases; or (2) written refusal to consent to acceptance of the settlement offer." § 19–511(b). If the UM carrier refuses to consent to acceptance of the settlement offer, the UM carrier must pay the amount of the settlement offer to the injured person within 30 days following the refusal. If the UM insurer consents to the settlement offer, or otherwise fails to respond to the settlement offer as required by subsections (b) and (c) of § 19–511,[6] then the injured insured may accept the settlement offer from the liability insurer and execute a release "in favor of the liability insurer and its insured without prejudice to any claim the injured person may have against the uninsured motorist insurer." § 19–511(e).

 Applying the facts of this case to § 19–511, we hold that, in the context of § 19–511(e), executing a boilerplate, general release in favor of the liability insurer does not relieve the UM carrier from its contractual duty to issue a UM payment to its insured. Three considerations support this conclusion: (1) the text of the statute; (2) the purpose of the statute; and (3) matters of public policy. We discuss each of these considerations in turn.

### (1) The Text of the Statute

Section 19–511(e) states that the injured person may "execute releases in favor of the liability insurer and its insured

---

**6.** For instance, if a UM carrier neither (1) consents to the settlement offer nor (2) denies consent and pays the injured person the amount of the settlement offer, then the UM carrier fails to comply with the statute. In such a scenario, § 19–511(e)(2) allows the injured insured to go ahead and execute a release in favor of the liability insurer, despite the fact that the UM insurer has not responded to the settlement offer in accordance with § 19–511. We encountered this situation in *Kritsings,* which we will discuss in more detail in part II.

*without prejudice to any claim the injured person may have against the uninsured motorist insurer."* (Emphasis added). Simply put, a release in favor of the liability insurer cannot prejudice a claim against the UM insurer. The statutory language supports the position that Buckley's claim for UM benefits must be allowed.

Brethren argues that the language of § 19–511(e) requires an injured person to execute a narrow release only in favor of the liability insurer. Brethren maintains that "in the face of this straightforward statutory settlement procedure, Buckley signed a release far beyond that permitted under § 19–511(e)." We disagree. The statute does not say, as Brethren wants it to, that an injured person, in order to maintain its UM claim, may execute releases *only* in favor of the liability insurer and its insured. What the statute does say is that an injured person may "execute releases in favor of the liability insurer and its insured *without prejudice to any claim the injured person may have against the uninsured motorist insurer."* While the statute clearly provides that the release must include the insured tortfeasor and its insurer, it does not otherwise limit the scope of the release. If we were to adopt Brethren's interpretation of the statute, we would be required to read the word "only" into the statute, *viz.,* an injured person may "execute releases *only* in favor of the liability insurer and its insured...." This we cannot do. *See, e.g. Taylor v. NationsBank N.A.,* 365 Md. 166, 181, 776 A.2d 645 (2001) (Courts "neither add nor delete words to a clear and unambiguous statute to give it a meaning not reflected by the words of the Legislature....").

### (2) The Purpose of the Statute

■ When dealing with a matter of statutory construction, "our endeavor must be to identify the 'objective, goal, or purpose' of the legislative scheme, and to construe the statute in a way that will advance that purpose, not frustrate it." *Neal v. Fisher,* 312 Md. 685, 693, 541 A.2d 1314 (1988) (citation omitted). We pause to consider the purpose of Maryland's motor vehicle insurance scheme, and specifically § 19–511.

■■■ "[T]he legislative purpose behind adopting motor vehicle regulations that require insurance on vehicles is to promote the established legislative policy in Maryland that seeks to assure that victims of automobile accidents have a guaranteed avenue of financial redress." *Arrow Cab v. Himelstein,* 348 Md. 558, 565, 705 A.2d 294 (1998) (citation and quotation marks omitted). "Since 1975, Maryland has mandated that motor vehicle liability insurance policies issued in this State contain UM coverage, providing an amount of coverage equal to the minimum amount required under the financial responsibility laws for liability coverage." *Kritsings,* 189 Md.App. at 374, 984 A.2d 395. "The purpose of the uninsured motorist statute is to provide minimum protection for individuals injured by uninsured motorists and should be liberally construed to ensure that innocent victims of motor vehicle collisions are compensated for their injuries." *Erie Ins. Exch. v. Heffernan,* 399 Md. 598, 612, 925 A.2d 636 (2007) (citations omitted). "Consistent with the public policy of affording minimal protection for innocent victims, an insured can purchase a higher amount of uninsured motorist insurance which will become available when the insured's uninsured motorist coverage, as well as his damages, exceed the liability coverage of the tortfeasor." *Id.* (citation and quotation marks omitted). "The effect [i]s to provide an injured insured with compensation equal to that which would have been available had the tortfeasor carried liability insurance in an amount equal to the amount of the injured insured's UM coverage." *Kritsings,* 189 Md.App. at 375, 984 A.2d 395.

■■■ One of the primary reasons for enacting § 19–511 "was to provide a remedy to a problem that ha[d] existed in Maryland's tort system for some time." *Keeney v. Allstate Ins. Co.,* 130 Md.App. 396, 401, 746 A.2d 947 (2000). As expressed in *Keeney,* under the old system,

an injured person who ma[de] a claim against a liability carrier for limits available under the liability policy [wa]s frequently not allowed by their uninsured/underinsured motorist carrier to give the liability carrier a full release of their claim. Therefore, if the injured person wishe[d] to

make an additional claim for their injuries against their underinsured motorist coverage, they g[o]t caught in a situation where the liability carrier w[ould] not give them the limits of the at-fault party's policy without a release and the uninsured/underinsured motorist carrier w[ould] not allow them to give a release to the liability carrier. As a result, they [we]re unable to recover funds from either carrier. This dilemma c[ould] cause a lengthy delay in settlement.

*Id. Keeney v. Allstate Ins. Co.,* 130 Md.App. 396, 401, 746 A.2d 947 (2000) Under the new scheme, the insured party received "his money more quickly and the uninsured/underinsured motorist carrier would have 'up front' the liability settlement." *Id.* In short, Maryland's UM statute is designed to expedite and simplify recovery by persons injured by a UM motorist.

Critically important to the dispute before us, as we just explained, § 19–511 was enacted to remedy the standstill that occurred when an injured insured was "not allowed by their uninsured/underinsured motorist carrier to give the liability carrier *a full release of their claim." Id.* at 401, 746 A.2d 947 (emphasis added). Holding, as Brethren urges us to do, that a full, general release relieves the UM carrier of its obligation to issue a UM payment to its insured would frustrate the purpose of enacting § 19–511. The purpose of the UM settlement scheme is to expedite settlement negotiations; not to prolong them. We will not impose an additional obligation on the injured insured to wrangle with the liability carrier over the terms of a boilerplate release. More often than not the liability carrier will insist on obtaining a general release to protect its insured against a future joint tortfeasor claim, which would leave the injured insured in a position where she could not recover funds from either carrier. This is the exact scenario that § 19–511(e) was designed to remedy. We must heed the teachings of *Heffernan* and "liberally construe[ ] [the statute] to ensure that innocent victims of motor vehicle collisions are compensated for their injuries." *Heffernan,* 399 Md. at 612, 925 A.2d 636.

### (3) Public Policy

Finally, § 19–511 must be read within the context of Maryland's strong public policy favoring compensation of those injured by UM drivers. *Forbes v. Harleysville Mut. Ins. Co.*, 322 Md. 689, 697, 589 A.2d 944 (1991). "Any provisions of [an] insurance policy which purport to condition, limit or dilute the unqualified uninsured motorist coverage mandated by the statute are void and unenforceable." *Nationwide Mut. Ins. Co. v. Webb*, 291 Md. 721, 730, 436 A.2d 465 (1981). The Court of Appeals "has consistently rejected attempts by insurers, as well as insureds and the insurance commissioner, to circumvent the plain language of the required coverage provisions of the statutes dealing with automobile insurance." *Nationwide Mut. Ins. Co. v. Webb*, 291 Md. 721, 730, 436 A.2d 465 (1981) (citing *Yarmuth v. Gov't Employees Ins. Co.*, 286 Md. 256, 407 A.2d 315 (1979); *Reese v. State Farm Mut. Auto. Ins.*, 285 Md. 548, 403 A.2d 1229 (1979); *State Farm Mut. v. Ins. Comm'r*, 283 Md. 663, 670–74, 392 A.2d 1114 (1978); *Government Employees Ins. v. Harvey*, 278 Md. 548, 366 A.2d 13 (1976); *Travelers Ins. Co. v. Benton*, 278 Md. 542, 365 A.2d 1000 (1976); *State Farm v. Md. Auto. Ins. Fund*, 277 Md. 602, 356 A.2d 560 (1976); *Maryland Auto. Ins. Fund v. Stith*, 277 Md. 595, 356 A.2d 272 (1976)). Thus, although we recognize that, in a tort action in Maryland, a release of "all other persons, firms or corporations" generally serves to release other parties from liability arising out of the tort, *see Cupidon v. Alexis*, 335 Md. 230, 237, 643 A.2d 385 (1994), this general rule only applies "in the absence of constitutional, statutory or clear important policy barriers." *Bernstein v. Kapneck*, 290 Md. 452, 459, 430 A.2d 602 (1981). Such statutory and public policy barriers exist in this case.

Brethren relies on a line of cases originating with *Pemrock, Inc. v. Essco Co.*, 252 Md. 374, 249 A.2d 711 (1969) to support its contention that Buckley is barred from recovery of her UM benefits by reason of the release she gave GEICO. We are not persuaded by this argument.

"Releases are contracts [and] are construed and applied according to the rules of contract law." *Owens–Illinois, Inc. v. Cook,* 386 Md. 468, 495–96, 872 A.2d 969 (2005) (citations omitted). "Moreover, it is well settled that a release is to be construed according to the intent of the parties and the object and purpose of the instrument, and that intent will control and limit its operation." *Id.* (citations and quotation marks omitted).

The release at issue in the instant case stated, in part:

> I/we ... do ... hereby remise, release, and forever discharge **Harvey Betts,** Releasee(s), successors and assigns, and/or his, her or their associates, heirs, executors and administrators, and *all other persons, firms or corporations* of and from any and every claim, demand, right or cause of action, of whatever kind of nature ...

(Underline and italics added). Brethren, relying on *Pemrock,* contends that the phrase "all other persons, firms or corporations" bars Buckley from recovering UM benefits that she would otherwise be entitled to under her insurance policy with Brethren.

We do not view *Pemrock* and its progeny as controlling the outcome of this issue. As the Court of Appeals explained in *Peters v. Butler,* 253 Md. 7, 251 A.2d 600 (1969) and *Cupidon,* 335 Md. at 237, 643 A.2d 385, *Pemrock* stands for the proposition that a general release that references "all other persons, firms, [or] corporations" releases other potential joint tortfeasors. *See Peters,* 253 Md. at 10, 251 A.2d 600 (holding that "a release by an injured person of a joint tortfeasor operates by the use of the releasing phrase 'all other persons, firms and corporations' to discharge other tortfeasors although they are not named"); *Cupidon,* 335 Md. at 237, 643 A.2d 385 ("the releases involved in [*Peters* and *Pemrock* ] ... released 'all other persons' [and] [i]t was [this language] on which this Court relied in holding that the documents did provide for the release of other tortfeasors within the meaning of § 19 of the Uniform Act"). The reasoning for this principal is the general rule "that there can be but one recovery for a single wrong."

*Pemrock,* 252 Md. at 379, 249 A.2d 711; *see also Huff v. Harbaugh,* 49 Md.App. 661, 670, 435 A.2d 108 ("The common thread weaving its way throughout each of these cases is that there can be but one recovery for a single wrong.") (citing *Trieschman v. Eaton,* 224 Md. 111, 166 A.2d 892 (1961); *Cox v. Maryland Elec. Rwys. Co.,* 126 Md. 300, 95 A. 43 (1915); *Grantham v. Prince George's County,* 251 Md. 28, 246 A.2d 548 (1968); and *Pemrock, Inc. v. Essco Co., Inc.,* 252 Md. 374, 249 A.2d 711 (1969)).

 This principle does not apply in this case. The scheme set out in § 19–511 is conceptually different in a fundamental way. The General Assembly decided that, in the context of UM coverage, there can be multiple recoveries: one from the liability insurer and another from the UM insurer. We agree with the MIA that the release in this case "must be viewed as having been drafted and signed consistently with [§ 19–511]" and that Brethren's "position is inconsistent with the plain language of § 19–511(e)." *Cf. Pennsylvania Nat'l Mut. Casualty Ins. Co. v. Gartelman,* 288 Md. 151, 156, 416 A.2d 734 (1980) ("Any provision of an automobile liability insurance policy which conflicts with the requirements of the statute regulating such policies is invalid.").[7]

In this case, Buckley is attempting to recover the exact benefit that she previously contracted for with Brethren; namely, the benefit of the UM provision of her automobile insurance policy. The very reason Buckley paid insurance premiums to Brethren was to ensure that she would be compensated in the event of an automobile accident like the one that occurred in this case.

---

**7.** Brethren suggests that we disregard the analysis of the MIA because "[a]n administrative agency's decisions on questions of law, such as the proper interpretation of a statute, are entitled to no deference." Although it is true that we must make the ultimate legal determination on questions of law, we may give "significant weight to an agency's experience in interpreting a statute the agency administers." *Cosby v. Dep't of Human Res.,* 425 Md. 629, 638, 42 A.3d 596 (2012) (citation and quotation marks omitted); *see also Nesbit v. Gov't Emples. Ins. Co.,* 382 Md. 65, 80, 854 A.2d 879 (2004).

The distinction between a claim in tort and a contract claim arising from an insurance policy in the context of releases was elucidated in *Huff v. Harbaugh*, 49 Md.App. 661, 435 A.2d 108 (1981). In that case, Harbaugh purchased a building and called Huff to obtain fire insurance. *Id.* at 663, 435 A.2d 108. Huff assured Harbaugh that the building was insured and that he would receive the policy soon by mail. *Id.* While Harbaugh awaited the arrival of the policy, the building was damaged by a fire that spread from the negligent demolition of an adjoining property. *Id.* at 663–64, 435 A.2d 108. Harbaugh sued the owner of the adjoining property and settled the case, executing a release with the owner. *Id.* at 664, 435 A.2d 108. Harbaugh, upon learning that he had no fire insurance on his building, sued Huff. *Id.* at 662, 435 A.2d 108. In response, Huff claimed that the release of the owner of the adjoining property also released him, because he was a joint tort-feasor with them. *Id.* at 665, 435 A.2d 108.

This Court disagreed with Huff. We said that "the issue becomes whether Huff's actions were 'in tort' and whether they can be said to have resulted in the 'same injury' to the Harbaughs as did the acts of [the adjoining property owner]." *Id.* at 666, 435 A.2d 108. The Court concluded that "[a] closer look at the cause of action against [Huff] reveals that its premise is not the fire damage to the building, but rather a breach of promise to secure fire insurance." *Id.* The Court continued that "it appears that the appellant's liability was not based on tort law" and that "the essential nature of [Huff's] behavior remains the breach of contract [claim]." *Id.* at 666, 668, 435 A.2d 108. Thus, in holding that Huff could not avoid liability as an alleged joint tortfeasor, we stated that the "definition of joint tortfeasors [requires] a closer relationship between wrongdoers with respect to cause of action and injury than exists in the present case." *See Ralkey v. Minnesota Mining & Mfg. Co.*, 63 Md.App. 515, 528, 492 A.2d 1358 (1985) (explaining that in the *Huff* case, "[r]ather than bringing separate tort claims, Harbaugh had separate causes of action—one in tort and one in contract.... Because of this distinction, there was no joint tort-feasor relationship between

Huff and the owner and contractor that would include Huff in the release.").

Here, Buckley incurred two separate injuries that served as the basis for two separate causes of action—one in tort against Betts and one in contract against Brethren. *See Kritsings v. State Farm Mut. Auto. Ins. Co.*, 189 Md.App. 367, 376, 984 A.2d 395 (2009) ("An injured insured with UM coverage has a tort action against the tortfeasor and a contract action against the UM insurer."); *West Am. Ins. Co. v. Popa*, 352 Md. 455, 462–63, 723 A.2d 1 (1998) ("Under the Maryland uninsured/underinsured motorist statutory provisions, when an insured under an automobile insurance policy has incurred damages as a result of the allegedly tortious driving by an uninsured or underinsured motorist, the insured has the option of initially bringing a contract action against his or her insurer to recover under the policy's uninsured/underinsured motorist provisions or of initially bringing a tort action against the tortfeasor."). The independent breach of contract claim originates in a legal source separate from Betts's original misconduct and involves distinct elements of damages. As evidenced in *Huff*, the settlement of one independent cause of action (tort) does not necessarily result in the complete satisfaction of the other (contract). *Huff*, 49 Md.App. at 670, 435 A.2d 108 ("[W]here it can be established that there is more than one wrong at issue, involving independent parties, the release of one wrongful party would not serve to release any other.").

Treating a tort claim differently from a contract claim in this context makes sense. Buckley's tort claim against Betts was based on the principle that one who causes another's injuries through some form of legal fault, such as negligent or intentional conduct, is liable for the injuries and damages caused by that misconduct. Under this tort theory of liability, Buckley was entitled to a money judgment for medical expenses, any permanent injury or disability, and loss of earnings.

Buckley's contract claim against Brethren derives not only from her previously bargained for insurance policy but also

from Maryland's statutory framework governing UM coverage. *Kremen v. State Auto. Ins. Fund,* 363 Md. 663, 674, 770 A.2d 170 (2001) ("[T]he promise to defend the insured, as well as the promise to indemnify, is the consideration received by the insured for payment of the policy premiums.") (citations and quotation marks omitted). This claim is founded on significantly different legal principles than her tort claim. The general release that Buckley executed with GEICO was intended to protect Betts and GEICO from claims by unknown joint tortfeasors (and potentially Brethren if it did not waive its right to subrogation). Once Brethren waived its right to subrogation, Betts was fully protected against a potential claim by Brethren. In this context, it is implausible that the parties could have intended to release Brethren from its obligation to pay Buckley under the UM provision of her insurance policy. As stated in *Nationwide Mut. Ins. Co. v. Webb,* 291 Md. 721, 737, 436 A.2d 465 (1981), to maintain a position such as Brethren's "is flatly inconsistent with the purpose of placing the insured in the same position as he would have been if the tortfeasor had been insured, and inconsistent with the principle of liberal construction."

This same result was reached in *Globe American Casualty v. Chung,* 76 Md.App. 524, 547 A.2d 654 (1988), *vac. on other grounds,* 322 Md. 713, 589 A.2d 956 (1991). Mr. Chung operated a gas station. He was killed when a customer hit him with a car while attempting to drive off with gasoline without paying. *Id.* at 527, 547 A.2d 654. Mr. Chung maintained two insurance policies at the time of his death. One with Nationwide that insured him against robbery and burglary and another with Globe Insurance, a motor vehicle liability insurance policy. *Id.* at 529, 547 A.2d 654. On behalf of Mr. Chung's widow, demand was made upon Nationwide for $6,000. *Id.* at 528, 547 A.2d 654. Coverage was initially denied by Nationwide, thus prompting a suit for recovery by the personal representative of Mr. Chung's estate. Summary judgment was granted to the personal representative and Nationwide gave the personal representative $6,000 in exchange for a release of all "actions, causes of actions, claims"

against Nationwide "and any and all other persons, firms, and corporations. . . ." *Id.* at 529, 543, 547 A.2d 654.

Subsequently, the personal representative of Mr. Chung's estate instituted a survival action against Globe Insurance, "seeking payment of what then would have been an additional $20,000 under the Uninsured Motorist provision of the policy." [8] Globe Insurance contended that the broad language of the release procured by Nationwide from the personal representative operated to release all claims against it. This Court disagreed and stated:

> The document before us does not release [Globe Insurance]. In the blank space provided on the form for the name of the party being released and discharged, the name "Nationwide Mutual Insurance Company" appeared. Although the phrase "any and all other persons, firms, and corporations" appeared following Nationwide's name, the release did not otherwise suggest, hint, or identify [Globe Insurance] as a party being released or discharged. When considered in light of the circumstances surrounding its execution, it is clear that the parties to the release [Nationwide and the personal representative] did not intend to release [Globe Insurance]. [Globe Insurance] was not a party to the release, paid no consideration to be released, and was unaware of the existence of the release at the time it was originally executed. To interpret the release as absolving [Globe Insurance] from liability on its contractual obligation to the [personal representative] would be giving [Globe Insurance] a gratuitous windfall not remotely contemplated by the parties to the release.

*Id.* at 543–44, 547 A.2d 654. Similar circumstances exist in this case. Brethren was not a party to the release between GEICO and Buckley and paid no consideration to be released. More importantly, Brethren knew that a release would be executed and knew that it would be executed by Buckley to

---

8. Mr. Chung's widow also received $20,000 from Globe Insurance as a result of a wrongful death claim under Mr. Chung's insurance policy with Globe Insurance. *Id.* at 530, 547 A.2d 654.

the benefit of Betts and GEICO pursuant to § 19–511. Brethren was also fully aware that Buckley planned on pursuing her claim under the UM provision of her insurance policy. Once Brethren waived its right to subrogation against Betts, GEICO had no conceivable reason to prevent Buckley from recovering a UM payment from Brethren. We adopt the reasoning set out in *Chung*, 76 Md.App. at 544, 547 A.2d 654: to interpret the release as absolving Brethren from liability on its contractual obligation to Buckley would be giving Brethren a gratuitous windfall not remotely contemplated by the parties to the release.

We hold that the general release executed between Buckley and GEICO did not relieve Brethren of its contractual and statutory duty to issue a UM payment pursuant to the terms of Buckley's insurance policy and § 19–511.

This is not the end of the analysis in this case. Even though Brethren cannot use the release as a defense to its obligation to issue a UM payment to Buckley, Brethren may still be able to assert defenses of contributory negligence and assumption of the risk. We discuss.

## II. Whether Brethren Consented to the Settlement

The issue of whether Brethren is deemed to have consented to the settlement offer between Buckley and GEICO dictates the future course of this litigation.

Brethren argues that "[t]he issue of whether Brethren 'consented' to settlement by Buckley was never decided by the trial court." In Brethren's view, "[w]ere this Court to reverse the trial court's entry of summary judgment ... the case would have to be remanded to the Circuit Court for a decision on whether Brethren 'consented' to the settlement in such a way that Brethren would be deemed to have waived the defenses of contributory negligence and assumption of the risk, as per *Kritsings v. State Farm Mut. Auto. Ins. Co.*, 189 Md.App. 367, 984 A.2d 395 (2009)."

Buckley argues that "Brethren's consent has been admitted both in its representative's sworn affidavit and in pleadings

filed on its behalf by its counsel in the trial court"; thus, according to Buckley, "Brethren has conclusively admitted that it consented to the settlement between Ms. Buckley and Mr. Betts." [9]

The circuit court did not address whether Brethren consented to the settlement with the tortfeasor. Because there may be unresolved factual questions pertaining to the consent issue, we will remand this matter for further proceedings. On remand, the circuit court must determine whether Brethren consented to GEICO's settlement offer to Buckley. If Brethren consented to the settlement offer, then Brethren "cannot thereafter contest tort liability," *see Maurer*, 404 Md. at 73, 945 A.2d 629, and on remand, it will not be able to assert defenses of contributory negligence and assumption of the risk. If Brethren is deemed to have *not* consented to the settlement offer, then Brethren may be able to assert these defenses. For the benefit of the parties and the circuit court on remand, we will frame and explore this issue further.

First, we return to the statutory framework surrounding the issue of consent. As discussed earlier, when the liability insurer of the alleged tortfeasor offers its policy limits to the injured person, the injured insured must send a copy of the offer by certified letter to the injured insured's UM carrier. § 19–511(a). Within 60 days after receipt of the notice, the UM carrier "shall send to the injured person: (1) written

---

9. Notably, this issue was addressed, albeit tangentially, by the MIA. It concluded that "Maryland law prevents Brethren from raising tort defenses against a UM policy holder after consenting to [a] settlement with the tortfeasor." Unfortunately, the MIA's analysis on this point is of little value to the proceedings before us; it appears from the opinion that, at the time the parties appeared before the MIA, all parties agreed that Brethren had in fact consented to the settlement between Buckley and GEICO. After the MIA issued its opinion, however, we published *Kritsings*, which clarified the issue of what constitutes consent on behalf of a UM carrier. Following *Kritsings*, Brethren changed its position on the issue of consent and no longer conceded that it provided Buckley with its consent to settle her claim with GEICO. As we will explain more fully *infra*, our analysis of whether Brethren can use tort defenses on remand cannot operate under the assumption that Brethren consented to the settlement.

consent to acceptance of the settlement offer and to the execution of releases; or (2) written refusal to consent to acceptance of the settlement offer." § 19–511(b). If the UM carrier refuses to consent to acceptance of the settlement offer, the UM carrier must pay the amount of the settlement offer to the injured person within 30 days following the refusal. If the UM carrier consents, then the injured insured may execute a release in favor of the liability insurer without prejudice to its UM claim against the UM insurer.

 To be clear, in order to comply with § 19–511, after a UM carrier receives notice of a settlement offer from an injured insured, the UM carrier must do one of two things: it must either (1) consent to the settlement offer (and, as a result, waive its right to contest tort liability) or (2) refuse to consent and pay the injured insured the amount of the settlement offer within 30 days of issuing its refusal to consent. While the statute contemplates a binary world, reality can be more complicated.

In this case, Brethren neither expressly consented to the settlement offer nor did it expressly refuse to consent to the settlement offer. Instead, the following occurred. Buckley sent Brethren a letter on August 29, 2007 explaining that:

> [GEICO has] offered [its] policy limits of $100,000.00 in settlement for this claim and [is] willing to settle the case accordingly if the tortfeasor, Mr. Harvey Betts is released from liability and [subrogation]. This letter is a request that you permit this to occur pursuant to *Insurance Article, § 19–511*. (Italics in original).

Ms. Karen Kidwell, Brethren's adjuster assigned to Buckley's case, issued the following response to the letter on October 30, 2007:

> Thank you for your recent letter concerning Ms. Buckley and Mr. Betts. We will waive any subrogation action against Mr. Betts. If you have any further questions, please do not hesitate to contact me.

Conspicuously absent from this response is any indication as to whether Brethren consented to the settlement.

Nevertheless, Buckley is correct to point out that Brethren, at various times throughout this case, represented that it had consented to the settlement. In its motion for summary judgment, Brethren stated that "approximately 10 months after Brethren agreed to waive subrogation *and consented to the settlement of Plaintiff's claims against Betts,* Plaintiff filed this suit against Brethren, for UIM benefits." (Emphasis added). Attached to Brethren's motion was an affidavit executed by Ms. Kidwell, Brethren's adjuster, in which she stated (emphasis added):

Exhibit 3 is a true and correct copy of the letter I sent to [Buckley's counsel], in response, dated October 30, 2007, in which, on behalf of Brethren, I agreed to waive any subrogation claim Brethren might have against Harvey Betts and *consented to the settlement of Ms. Buckley's claims* against Mr. Betts and GEICO for payment of GEICO's $100,000.00 policy limits.

Moreover, the parties later stipulated, as stated in Brethren's opposition to Buckley's motion for summary judgment, "that the only liability issue remaining in this breach of contract case was the effect of the release of the entire world executed by Buckley." Thus, before December 1, 2009, the parties agreed that Brethren gave its consent to GEICO's settlement offer.

On December 1, 2009, we issued *Kritsings,* and as a direct result, Brethren changed its position on the consent issue: namely, it argued that its reply letter to Buckley never amounted to consent.

In *Kritsings,* we encountered a factual scenario analogous in some respects to the case at hand. Kritsings pursued a UM coverage claim against State Farm Insurance following a motor vehicle accident. In response to her claim for UM coverage, State Farm sent the following letter on March 9, 2006, which stated, in pertinent part:

Enclosed please find a copy of our correspondence of April 10, 2003, previously forwarded to counsel for Ms. Woodward, indicating subrogation has been waived against Karen

> Smith, and *we are denying a future claim for underinsurance benefits. Our investigation thus far indicates Ms. Woodward was negligent for failure to stay right of center when she initiated contact with Ms. Smith's vehicle.*

*Kritsings,* 189 Md.App. at 372, 984 A.2d 395 (emphasis added). This letter expressly denied liability on behalf of State Farm. The letter also referenced a letter from April 10, 2003, which stated, in pertinent part:

> It is our conclusion your client was negligent in this accident for failure to stay right of center when she crossed the center line and initiated contact with the vehicle driven by Karen Smith. Therefore, we are unable to honor your client's claim for Underinsurance Benefits.
>
> Please note State Farm Mutual Automobile Insurance Company is waiving subrogation against Karen Smith.

*Id.* Viewing these two letters together, we noted in *Kritsings* that "[t]he letters in 2003 and March, 2006 waived subrogation . . ., expressly denied liability, and did not expressly consent to settlement." *Id.* at 379, 984 A.2d 395. We explained:

> Appellee's denial of liability implied that it did not consent to settlement. The waiver of subrogation did not imply consent because consent would mean that appellee intended to pay up to its limits without recourse, a result inconsistent with the denial of liability.

Accordingly, we held that:

> At most, appellee's response to appellant's notice, pursuant to § 19–511, constituted a violation of the statute in that appellee neither gave written consent to acceptance of the offer from the tortfeasor or written refusal to consent. Given the absence of a written consent to settle, and treating appellee's response as either a written refusal or the absence of written consent or written refusal, appellee did not pay the amount of the settlement offer to appellant. As a result of appellee's noncompliance with subsection (b) or (c), appellant, by statute, could and did accept the settlement offer and execute a release without prejudice to the claim asserted herein against appellee. § 19–511(e)(2). In

other words, appellee's violation of the statute prevented it from arguing that entering into the settlement was a breach of its policy. The violation may have compromised appellee's subrogation rights, had they not been waived, but it did not have the effect of an express consent to settle or an admission of liability.

*Id.* at 380, 984 A.2d 395.

Based on *Kritsings,* Brethren argues that its response to Buckley's letter did not constitute consent, and, as stated in its opposition to Buckley's own summary judgment motion before the circuit court, "Brethren did not waive its rights to rely on assumption of the risk and/or contributory negligence as defenses in this case."

Our case is factually distinguishable from *Kritsings* in at least two respects. First, in *Kritsings,* State Farm "expressly denied liability," *id.* at 379, 984 A.2d 395, when it stated that "[i]t is our conclusion your client was negligent in this accident for failure to stay right of center...." *Id.* at 372, 984 A.2d 395. In our case, Brethren did not expressly deny liability or comment on liability whatsoever; it only stated that it would waive its subrogation claim against GEICO. Second, in *Kritsings,* State Farm did not file papers in the circuit court proceeding acknowledging that it had consented to the settlement.

The circuit court did not decide whether Brethren's reply to Buckley amounted to a consent to the settlement offer in the context of § 19–511 or whether Brethren is irrevocably bound by its assertions to the court that it consented to the settlement. Moreover, there may be other arguments relating to the consent issue that are currently not before us; the parties should be able to assert these arguments before the circuit court on remand. If the circuit court concludes that, in the final analysis, Brethren consented, then it would not be "allowed to contest the issues of [Betts's] tort liability ...." and the remaining issue in Buckley's UM coverage action would be the amount of damages. *Maurer,* 404 Md. at 75, 945 A.2d 629. On the other hand, if the court decides that Brethren did not

consent, the insurance company would be free to raise defenses as to Betts's tort liability. *Kritsings,* 189 Md.App. at 379–80, 984 A.2d 395.

**THE JUDGMENT OF THE CIRCUIT COURT FOR BALTIMORE COUNTY IS VACATED AND THIS CASE IS REMANDED TO IT FOR FURTHER PROCEEDINGS CONSISTENT WITH THIS OPINION.**

**APPELLEE TO PAY COSTS.**

EYLER, DEBORAH S., J., dissenting.

I respectfully dissent from the majority's opinion.

Ember Buckley was injured in a single-car accident when she was a passenger in a car being driven by Harvey Betts. She sued Betts—the only alleged or possible tortfeasor—for negligence. Upon reaching a settlement with Betts for $100,000, which was the limit of his automobile liability insurance policy with GEICO, Buckley executed a general release. The release discharged any claim of any nature Buckley had against "all persons, firms, and corporations" arising out of the accident.

Buckley had sued Brethren, her automobile insurance carrier, for breach of contract for failure to pay pursuant to her Uninsured/Underinsured Motorist ("UM") coverage. By signing the general release, Buckley released her breach of contract claim against Brethren. This outcome is dictated by the terms of the general release and is not changed by section 19–511 of the Insurance Article.

## THE RELEASE

Buckley accepted GEICO's policy limits offer and executed a release entitled "**RELEASE IN FULL OF ALL CLAIMS**" ("Release") (bold in original). It is a classic general release. In relevant part, it states:

> ... Buckley, ... for the sum of **one hundred thousand** dollars (**$100,000**) ... do for myself ... hereby remise, release, and forever discharge **Harvey Betts** ... and all

other persons, firms or corporations of and from any and every claim, demand, right or cause of action, of whatever kind or nature, on account of or in any way growing out of any and all personal injuries and consequences thereof, including, but not limited to, all causes of action, preserved by the wrongful death statute applicable, any loss of services and consortium, any injuries which may exist but which at this time are unknown and unanticipated and which may develop at some time in the future, all unforeseen developments arising from known injuries, and any and all property damage resulting or to result from an accident that occurred on or about the **eighteenth** day of **March, 2007,** at or near **Saw Mill Court Baldwin, MD.** and especially all liability arising out of said accident including, but not limited to, all liability for contribution and/or indemnity.

(Bold in original.) A box containing the bolded words "**THIS IS A RELEASE IN FULL**" appears on the face of the Release, next to Buckley's signature line.[1]

The language of the Release is clear on its face. Buckley discharged Betts and "all other persons, firms or corporations" "of and from any and every claim, demand, right or cause of action, of whatever kind of nature, on account of or in any way growing out of any and all personal injuries and consequences thereof ... resulting or to result from [the] accident...." As to who is being released, the phrase "all other persons, firms or corporations" is not ambiguous. It means "all mankind," see *Peters v. Butler,* 253 Md. 7, 8, 251 A.2d 600 (1969), and therefore only can be read to include Brethren (just as it only can be read to include GEICO, Betts's liability insurer, which is not specifically named in the Release).

---

1. The majority opinion refers to the Release as "boilerplate," as if the language of the Release does not matter. Releases, like many other legal documents, often are on forms. The fact that a legal document is a form document does not make its language inoperative or not meaningful.

As to what is being released, the operative phrase of the Release encompasses every sort of claim that might exist resulting from the accident. It is not limited to tort claims, contribution or indemnity claims, contract claims, or claims only against joint tortfeasors or potential joint tortfeasors. It includes every claim "of whatever kind of nature" "in any way growing out of" the personal injuries Buckley sustained in the accident. Buckley's breach of contract claim against Brethren under the UM provision of her automobile insurance policy was a claim arising out of the personal injuries she suffered in the accident. The Release quite plainly discharged that claim.

*Pemrock, Inc. v. Essco Co., Inc.,* 252 Md. 374, 249 A.2d 711 (1969), is on point. Pemrock hired Essco to build poultry houses, which were made with material manufactured by Anderson. New Castle issued an insurance policy covering the poultry houses against direct loss caused by windstorms. On January 30, 1966, a snow storm with strong winds knocked the poultry houses down, damaging them. Pemrock and its mortgagee sued New Castle for breach of the insurance policy, asserting that the losses were covered by the policy. After New Castle impleaded Essco and Anderson, alleging that they were negligent in constructing the poultry houses, and that their negligence, not the windstorm, had caused the poultry houses to be damaged, Pemrock amended its complaint to add negligence counts against Essco and Anderson.

Pemrock settled her claim against New Castle. In doing so, she executed a general release discharging any "and all other persons, firms, corporations, associations or partnerships of and from any and all claims, actions, causes of action, demands, rights, damages, costs, loss of service, expenses and compensation whatsoever ... resulting or to result" from the event of January 30, 1966. 252 Md. at 376–77, 249 A.2d 711. Thereafter, Essco and Anderson moved for summary judgment on the ground that the general release executed by Pemrock not only discharged Pemrock's claim against New Castle but also discharged her negligence claims against them. The circuit court granted the motions. On appeal, the Court of Appeals affirmed. It held that the language of the general

release "in literal, plain, unambiguous words acquitted and discharged forever not only New Castle but also all other persons" from bodily injury and property damage resulting or to result from the collapse of the poultry houses. 252 Md. at 380, 249 A.2d 711.

Thus, by giving New Castle a general release in settlement of the contract claim against it, Pemrock also released her negligence claims against Essco and Anderson. It did not matter that the claims were of a different nature (contract versus tort), or that New Castle was not a tortfeasor and therefore could not be a joint tortfeasor with Essco and/or Anderson, if they were to be found negligent. Because the language of the general release discharged **all claims** resulting or to result from the January 30, 1966 storm and consequent damages, **against all persons, firms, and corporations,** Essco and Anderson were discharged from any liability in tort they may have had.

In reaching its holding, the *Pemrock* Court relied upon *Thomas v. Erie Ins. Exchange,* 229 Md. 332, 182 A.2d 823 (1962), another general release case. In *Thomas,* after the plaintiff was injured in an automobile accident she brought suit against the defendant driver. Under the defendant's liability insurance policy, the plaintiff was entitled to recover medical expenses. The plaintiff entered into a settlement with the driver, executing a release by which she discharged him and "all other persons, firms or corporations liable or who might be claimed to be liable" for damages "from any and all claims . . . ." 229 Md. at 334, 182 A.2d 823. The *Thomas* Court held that the general release language discharging "all persons" from liability for "all claims" barred the plaintiff from pursuing her claim for medical expenses against the driver's insurance company.

*Peters v. Butler, supra,* 253 Md. 7, 251 A.2d 600, decided shortly after *Pemrock,* also supports the conclusion that the Release in the case at bar discharged Buckley's contract claim against Brethren. In *Peters,* the plaintiff was injured when her husband's car, driven by her daughter, struck her as she

was standing behind a low brick wall at an apartment complex. The plaintiff and her husband entered into a settlement with their daughter, her daughter's liability insurance carrier, and their own carrier, for a total of $55,000, and executed what the Court denominated a "general release to all mankind." *Id.* at 10, 251 A.2d 600. The release contained almost exactly the same language as the Release in the case at bar, discharging "all other persons, firms or corporations . . ." from any and all claims arising out of the accident. *Id.*

After executing the general release, the plaintiff and her husband filed suit against the owner of the apartment complex, alleging negligence. The apartment complex raised the release as a defense and moved for summary judgment. The plaintiffs then sought to reform the release, arguing that they did not intend to release the owner of the apartment complex. The court found that the evidence did not support reformation, and granted summary judgment.

On appeal, the primary issue was whether under the Maryland Uniform Contribution Among Tortfeasors Act ("Act"), then codified in article 50, sections 16 through 24 of the Maryland Code, a general release of one joint tortfeasor that discharges "all other persons, firms, or corporations . . ." from liability arising from the accident releases all other tortfeasors. The plaintiffs argued that, because then-section 19 of the Act provided that the release of one joint tortfeasor did not operate to release the other tortfeasors "unless the release so provides," the apartment complex was not released, because it was not named in the release and it did not pay any consideration for the release. *Id.* at 9–10, 251 A.2d 600. The Court of Appeals rejected that argument, invoking the holding in *Pemrock* that "a general release to all mankind barred further suits against other entities involved in the occurrence which produced the settlement with one participant that led to the release." 253 Md. at 10, 251 A.2d 600. The fact that the person released is not named or has not given consideration is of no consequence. *See* William Prosser, *Prosser on Torts* § 49 (4th ed.1978) (explaining that "a release is a surrender of

a cause of action, which may be gratuitous or given for inadequate consideration").

Somewhat more recently, in *Cupidon v. Alexis*, 335 Md. 230, 643 A.2d 385 (1994), the Court of Appeals, relying upon *Pemrock* and *Peters*, held that release language in drafts issued to three plaintiffs who settled their automobile negligence claims against the driver of a car that struck the car in which they were riding as passengers did not operate to release their negligence claims against the driver of the car in which they were riding. The release language in the drafts stated "final settlement of any and all claims arising from bodily injury caused by accident on 01/17/91." 335 Md. at 282, 643 A.2d 389.

The Court held that this language was sufficient to release the other driver but was not sufficient to release the driver of the car in which the plaintiffs were riding. *Id.* at 237, 643 A.2d 389. The Court emphasized that the general releases in *Pemrock* and *Peters* discharged "all other persons" from liability. *Id.* It was the release of "all other persons" that discharged "all mankind" from liability for damage arising out of the storm in *Pemrock* and the automobile accident in *Peters.* The "settlement of any and all claims" did not operate to discharge all people, including all other tortfeasors, from liability, as would have happened had "all other persons" been released.

Returning to the case at bar, as noted several times, the Release signed by Buckley released Harvey Betts *"and all other persons, firms or corporations* of and from any and every claim, demand, right or cause of action, of whatever kind or nature, on account of or in any way growing out of any and all personal injuries and consequences thereof" arising out of the accident. (Emphasis added.) In other words, the plain language of the Release discharged "all mankind"—including Brethren—from liability of any sort arising out of the accident.

Maryland Court of Appeals law is clear that a general release of "all persons, firms, or corporations" releases "all

mankind" from liability arising out of an incident. As *Pemrock* makes plain, that is so for claims against tortfeasors and also for contract claims against insurance companies. In the case at bar, the plain and unambiguous language of the Release discharged Buckley's claim against Brethren.

## THE STATUTE

Under section 19–511(a) of the Insurance Article, when GEICO made a written offer to Buckley to pay its policy limits in settlement of her claim against Betts, Buckley had a duty to notify Brethren of GEICO's offer, in writing and by certified mail. Former counsel for Buckley did so, attaching to her correspondence to Brethren the written offer from GEICO. When Brethren received the letter from former counsel for Buckley, it had a duty under section 19–511(b)(1) and (2) to respond in writing within 60 days by sending Buckley *either* a written consent to her acceptance of the GEICO settlement offer and execution of releases or a written refusal to consent to her acceptance of the GEICO settlement offer.

Brethren did neither. Instead, it sent a letter to Buckley's former counsel that did not say it consented to Mrs. Buckley's accepting GEICO's offer and did not say that it was refusing to consent to Buckley's acceptance of GEICO's settlement offer. All the letter from Brethren said was that it would waive its subrogation rights against Betts. As this Court explained in *Kritsings v. State Farm Mut. Auto. Ins. Co.*, 189 Md.App. 367, 984 A.2d 395 (2009), when a UM carrier fails to respond in writing that it either is consenting to its insured's accepting the alleged tortfeasor's liability carrier's policy limits offer or is refusing to so consent, it violates section 19–511(b).[2]

---

2. We further explained that the statutory violation is not equivalent to a consent by the UM carrier to the insured's accepting the offer, however, which, under *Maurer v. Pennsylvania National Mutual Casualty Insurance Co.*, 404 Md. 60, 945 A.2d 629 (2007), results in the UM carrier's conceding to the liability of the alleged tortfeasor. *Kritsings*, at 377–79, 984 A.2d 395.

Because the letter from Brethren to Buckley's former counsel is clear, in that it does not consent to Buckley's accepting GEICO's offer nor does it refuse to consent to her accepting the offer, there is no dispute of fact that needs to be resolved as to the meaning of the letter.

Section 19–511(e) provides in relevant part that if the UM carrier "has not met the requirements of subsection (b)"—that is, has neither consented nor refused to consent to the injured person's accepting the liability carrier's offer within the 60–day period—the injured person may accept the liability carrier's policy limits offer and *"execute releases in favor of the liability insurer and its insured without prejudice to any claim the injured person may have against the uninsured motorist insurer."* (Emphasis added.) So, here, Brethren's failure to adhere to the requirements of subsection (b) meant that Buckley could, if she so desired, accept GEICO's $100,000 policy limits offer and execute releases in favor of GEICO and Betts.

Buckley in fact accepted GEICO's settlement offer, but instead of executing a release, or releases, discharging the liability of GEICO and Betts (that is, "in favor of the liability insurer and its insured"), she signed a release that discharged their liability **and** the liability of all other persons, firms, or corporations, *i.e.,* "all mankind," for claims arising out of the accident. If the Release had discharged Betts and GEICO without releasing the rest of the world, it would have been executed without prejudice to any claim Buckley had against Brethren. Prior to enactment of section 19–511(e), an injured person who had a UM claim could not as a practical matter settle for policy limits with the tortfeasor's liability carrier, because the liability carrier would demand a release, but a release would constitute a breach of the UM carrier's policy, as it could impair the UM carrier's rights. Section 19–511(e) eliminated that Catch–22 by providing that the injured person could accept a policy limits settlement from the alleged tortfeasor and give a release in favor of the alleged tortfeasor and his liability carrier without losing his contract claim against

his UM carrier. *See Kritsings, supra,* at 378–79, 984 A.2d 395.

By operation of section 19–511(e), the injured person's claims against his UM carrier are preserved even though the injured person has accepted the settlement offer of the alleged tortfeasor's liability carrier and has released the liability carrier and the alleged tortfeasor. That section does nothing to change the consequences of the injured person's executing a general release of "all persons" instead of executing a release in favor of the liability carrier and the alleged tortfeasor. When the injured person executes a general release of "all persons," the general release still discharges the entire world from liability for all claims of any sort (as this Release provided) arising out of the accident. As explained above, by its plain and unambiguous language, Buckley's release discharged her claims against everyone, including Brethren.

The majority misreads the language of section 19–511(e) to mean that, if the UM carrier does not comply with subsection 19–511(b), and the injured person accepts the settlement and releases not only the liability carrier and the alleged tortfeasor *but also the entire world,* the injured person's cause of action against his UM carrier is preserved. If section 19–511(e) is read that way, it produces the absurd result that, so long as the liability carrier and the alleged tortfeasor are released, it does not matter what the release says about the liability of anyone else. A release discharging the entire world from liability would have exactly the same effect as a release discharging only the alleged tortfeasor's liability carrier and the alleged tortfeasor from liability. The statute cannot reasonably be read to nullify the plain language of a release.

The majority also misreads section 19–511(e) by concluding that, if the statute meant that releasing **only** the alleged tortfeasor and his liability carrier, and no one else, would preserve the injured person's claim against his or her UM carrier, the statute would have included the word "only," which it does not; and it is improper to read the word "only" into the statute when it is not there.

There was no reason for the legislature to have included the word "only" in this statute, however. The statute as written provides that, when the alleged tortfeasor and his liability carrier are released, the UM carrier is not released. Thereafter, the language of the release used will dictate the result, as usual. If another specifically named person is released as well, the liability of the UM carrier still will be preserved; for example, if in addition to the alleged tortfeasor and his liability carrier, another person also is released (and that person is not the UM carrier), the UM claim will remain intact. Here, however, the Release specifically discharged Betts but also discharged everyone else in the world. Thus, the Release discharged Betts and GEICO, as GEICO is a member of the rest of the world, but also discharged the entire world, which includes Brethren. Therefore, even though Betts and GEICO were released, the UM claim was not preserved, because Brethren was released as well.

Obviously, upon entering into a settlement with a person injured in an accident, the alleged tortfeasor and his liability carrier are entitled to be released from liability stemming from the accident. The statutory language does not limit the number of people or entities the injured person may release, however. It simply says that the injured person's rights against the UM carrier are preserved even after the alleged tortfeasor and his carrier have been released. If the injured person releases the alleged tortfeasor, his liability carrier, **and all mankind,** then all mankind—including the UM carrier—has been released.

By executing a general release of all other persons, firms or corporations, Buckley released her claims relating to the accident against everyone, including her contract claim against Brethren.[3] This Court cannot and should not adopt a strained

---

3. In this case, if all other things had been equal but Buckley had not executed a general release, the proper disposition of this appeal would be a remand to the circuit court for a trial on Buckley's breach of contract claim against Brethren. Because the UM clause in Buckley's automobile insurance policy requires Brethren to indemnify her for damages for injuries sustained as a consequence of the wrongful acts of

and legally incorrect interpretation of the language of the Release or the language of Insurance section 19–511 to save Buckley's contract claim against Brethren. The contract claim could have been protected, but was not.

an uninsured or underinsured motorist who is not insured to her level of coverage, and because Brethren neither consented to nor refused to consent to Buckley's accepting the GEICO settlement offer, to prevail on her breach of contract claim Buckley would have to prove Betts's tortfeasor status, *i.e.*, that he failed to adhere to reasonable standards of care in the operation of his motor vehicle, thus causing her injuries and damages. Brethren could have defended on the issue of Betts's tortfeasor status at trial. *See Kritsings v. State Farm, supra.*